[Civ. No. 42735. First Dist., Div. Two. Dec. 29, 1978.]

CITY AND COUNTY OF SAN FRANCISCO et al.,
Plaintiffs and Respondents, v.
THE STATE OF CALIFORNIA et al., Defendants and Appellants.

**COUNSEL**

Evelle J. Younger, Attorney General, and Asher Rubin, Deputy Attorney General, for Defendants and Appellants.

George Agnost, City Attorney, and Marie Burke Lia, Deputy City Attorney, for Plaintiffs and Respondents.

**OPINION**

**KANE, J.**—This is an appeal from an order and judgment directing issuance of a peremptory writ of mandate ordering defendants (State) to fund a social service contract entered into between plaintiffs (County or San Francisco) and two private corporations pursuant to Welfare and Institutions Code,[1] section 12300 et seq. The background facts are relatively simple and may be summarized as follows:

By statute enacted in 1973, the Legislature introduced a host of so-called in-home supportive services for those recipients of public assistance who can remain in their own homes when such services are provided. In-home supportive services include such things as grocery shopping, laundry, cleaning, and housekeeping (§ 12300). While the full power to supervise every phase of the administration of social services, including homemaker and chore services, is vested in the state Department of Health (DOH) (§ 10600), the implementation of the homemaker and chore program is delegated to the counties. According to section 12302, each county is required to develop and submit a plan to the DOH that provides for the delivery of services; and in order to implement the plan, a county may contract with private individuals or agencies for the purchase of services. The right of the counties to contract, and to establish procedures, for the purchase of supportive services is circumscribed in the

---

[1]Unless otherwise indicated, all references will be made to the Welfare and Institutions Code of California.

statute[2] (§ 12302.1). The statute expressly provides that the cost of the service may not exceed by more than 10 percent the cost allowed by DOH (§ 12303).[3]

Based upon the above statutory scheme, in 1976 County published an invitation for bids for furnishing homemaker services to eligible welfare recipients. Initially, there were six bidders on the proposed contract, of whom three lower bidders were disqualified. Subsequently, the following bids were made: an individual bid by Hadley Hall at $8.03 per hour; an individual bid by Robert Lucas at $5.98 per hour; and a joint bid by San Francisco Home Health Services, Inc. (operated by Hall) and Health Conservation, Inc. (operated by Lucas) at $7.71 an hour. County accepted the joint bid of the two corporations rather than the low bid made by Lucas individually, despite the fact that it had been advised in a letter dated September 23, 1976, that State would reimburse San Francisco only up to $5.50 per hour for homemaker services.

In view of the apparent deviation from the maximum cost allowed, on June 30, 1977, a day before the contract became effective, DOH informed County that the $5.98 bid submitted by the lowest qualified bidder

[2]Section 12302.1 provides as follows: "Contracts entered into by a county under Section 12302 shall be for periods not exceeding one year and shall, in addition to including provisions required by Section 12303, be subject to the following:

"(a) Prior to initiating a contract or contracts pursuant to Section 12302, the county shall publicize its intention to solicit bids to enter into such contracts.

"(b) When the county has selected one or more contract proposals for tentative acceptance, the county board of supervisors shall conduct a hearing on the proposed contract or contracts, which shall be at a regularly scheduled meeting of the board of supervisors, and open to the public.

"(c) Public findings based on the hearing shall be made available to interested parties.

"(d) No contract for services provided under this article shall take effect until 30 calendar days have elapsed from the time of the public hearing required under this section.

"(e) The county board of supervisors may award one or more service contracts pursuant to this article based upon the fiscal responsibility of the service provider, experience of the service provider in providing services pursuant to this article, and any other consideration in the public interest; provided that *nothing in this subdivision shall preclude a requirement that contracts under this section be awarded on a competitive bid basis.*

"(f) The county, to insure fiscal and program compliance, shall review the contract during the contract term. Such review may include, but shall not be limited to, a fiscal audit." (Italics added.)

[3]At all relevant times section 12303 read in part that "A contract pursuant to Section 12302 shall include the following provisions:

"(a) *The cost of the service shall not exceed by more than 10 percent the allowable cost of the service as determined by the State Department of Health.*" (Italics added.)

(Lucas) was the reasonable cost of contract services; that County had provided no justification for awarding the contract in dispute to the joint bidder whose proposal was $639,000 higher than the individual Lucas bid; and that as a consequence State would not approve the contract accepting the joint bid of the two corporations.[4] Thereupon, County brought this action to compel State to perform its duties under section 12300 et seq., and especially to provide state and federal funds for payment of services under the contract. After a trial, the superior court found inter alia that in awarding the contract in dispute to the joint bidder, County had complied with all relevant statutes and regulations, and concluded that pursuant to statutory authority State was obligated to provide the requisite funding. A peremptory writ issued ordering the approval and funding of the contract awarded to the joint bidder.

Although the parties raise a number of issues on appeal, the fundamental question to be decided is whether homemaker and/or chore services contracts awarded by counties pursuant to the statute are subject to approval or disapproval by State. If this issue is to be resolved in the affirmative, the next crucial question arises: whether the disapproval of the contract at bench by State was reasonable and justified in the circumstances here present.

In discussing the first point, we initially note that the funding of the in-home supportive services does not constitute a state task alone. The brunt of the burden in furnishing these social services rests on the federal government which contributes matching funds (up to 75 percent) to a state's efforts and expenditures. However, the contribution by the federal

---

[4] The June 30, 1977, letter read in part as follows:

"*We do not approve award of the contract to the 'joint bid' of Health Conservation, Inc., and San Francisco Home Health Services. The county has provided no justification for awarding to a 'joint bid' that is higher by $639,000 than the individual bid submitted by one of the parties to the joint bid.*

"We have reviewed the documentation submitted regarding your proposed award of a new H/C contract. We are satisfied that the bid evaluation reports which you relied upon in making your decision were prepared satisfactorily. However, your decision to bypass a bidder determined by the panel and yourself to be qualified will result in an estimated additional cost of $639,000 to the H/C program over the life of the contract. We are confident in the work of the Review Committee, and the Committee's evaluation of the various bids. The Review Committee found HCI to be qualified, and you determined that HCI met all the terms and conditions of the Invitation for Bids. Therefore, we cannot approve an award to a higher bidder.

"*We have determined that the bid rate of your lowest qualified bidder ($5.98/hour) is a reasonable cost and will allow reimbursement for whichever contract you execute at that level,* so long as the contractor you choose did not bid at a lower rate." (Italics added.)

government to the financing of state social welfare is neither automatic nor unconditional. In order to qualify for the sizable federal aid, a state must comply with the conditions embodied in title XX of the Social Security Act (42 U.S.C. § 1397 et seq.). The most salient of these requirements are: that a single state agency must be designated which is responsible for the administration or the supervision of administration of the services (including the overall control and oversight of tit. XX activities) (42 U.S.C. § 1397b(d)(1)(C); 45 C.F.R. § 228.6(e) (1977)); that the services contracts must conform to federal law which requires that such contracts "Provide for a stated number of units of service at a specific dollar rate, or for a specific dollar amount, or for costs to be determined in accordance with acceptable cost allocation methods" (45 C.F.R. § 228.70(a)(5) (1977)); that the award be made to the responsible bidder whose bid is "most advantageous" to the state or local government (45 C.F.R. § 74.154(e)(1) (1977)); that the state is accountable for the federal funds (cf. 45 C.F.R. § 228.6(e)(4) (1977)); and, finally, that it is the state, not the counties that the federal government looks to for reimbursement or offsets where indicated. In recognition of these stated responsibilities, the federal statute vests the designated state agency with authority to make rules and regulations governing the administration of the state program (45 C.F.R. § 228.6(d) (1977)).

The California statutory scheme is in full conformity with federal law. At all relevant times, section 10600 provided in pertinent part that "the State Department of Health is hereby designated as the single or appropriate state agency *with full power to supervise every phase of the administration of services* for which grants-in-aid are received from the United States government or made by the state in order to secure full compliance with the applicable provisions of state and federal laws." (Italics added.) State's supervisory power is further underlined by section 10603.1 which provides that "*The State Department of Health* shall advise public officers regarding the administration of services by public agencies throughout the state, and *shall supervise the administration of such services to all persons receiving or eligible to receive such services.*" (Italics added.) (See also §§ 10553.1, 10609.1, 10613.1.) Consistent with the federal statute, section 12302.1 sets out in detail the requisite terms of the in-home services contracts, including the all-important requirement that such contracts must be entered into as a result of competitive bidding (see fn. 2, *ante*). Last, but not least, following the federal mandate, section 12303 sets an upper limit to the cost of in-home services contracts by providing that the allowable cost of services must be determined by

DOH, and that the payment made under such contracts may not exceed by more than 10 percent the cost allowed by the department (see fn. 3, *ante*).

██ ██ While the statutory provisions referred to above do not contain explicit language to the effect that the homemaker and chore services contracts are valid only if approved by the state, the statutory scheme as a whole reaffirms the premise that the state agency in charge of administration of social services does possess implied authority to approve or disapprove such contracts.

First, as indicated above, the statute grants *full power* to DOH, the designated single, financially liable state agency, *to supervise every phase of the administration of services.* This all-inclusive supervisory power necessarily embraces the power of fiscal control. In order to exercise fiscal control in an efficacious and meaningful way, however, the state must have authority to disapprove ill-considered, wasteful or overly burdensome social services contracts which unduly deplete the limited state welfare funds on the one hand, and shut off the all-important federal contribution on the other. The implied power to disapprove social service contracts, therefore, must be deemed to constitute an indispensable element of the full fledged supervisory power granted to DOH by way of express statutory mandate.

Second, as also set out earlier, the statute delegates the power to determine the maximum allowable cost of homemaker and chore services contracts to DOH (§ 12303; fn. 3, *ante*). It is plain that this cost-setting power of the state agency would be meaningless and futile if not combined with authority to enforce it. In short, the enforcement of the cost-limiting provisions postulates a state power to disapprove homemaker or chore services contracts in case they are in conflict with or contravene the cost-limitation mandated by the statute.

Third, the authority of the state to approve or disapprove the homemaker and chore services contracts is supported by sound legal policy. As mentioned earlier, state welfare funds are limited in amount even if contributed to a large extent by the federal government. The limited nature of the financial resources makes it imperative that the funds available be used in a prudent, thrifty and equitable way in view of the overriding objective that all eligible and needy welfare recipients be provided the in-home services to which they are entitled under the

statute. It is obvious that this statutory goal may be attained only if the designated single state agency has control over the allocation of the funds among the numerous counties and has the authority to strike a balance among the competing claims. Should the supervisory power of the state be curtailed and the respective counties be given a blank check in the state funding of such contracts as San Francisco advocates, the legislative objective to provide in-home supportive services to *all* needy and eligible welfare recipients would be frustrated, and the profligate and unreasonable spending of certain counties would result in depletion of the limited welfare resources at the expense of other equally eligible and needy welfare recipients.

Fourth, the state's power to disapprove wasteful and undesirable social services contracts is buttressed by the administrative directives issued by DOH and the longstanding practice established between State and the counties. Thus, guidelines attached to Social Services Letter No. 76-7 issued to all county welfare directors on July 16, 1976, emphasizes that *"County awards contract, contingent on Department of Health approval . . ."* and that *"The county will submit the contract . . .* to the Department of Health *for approval."* (Italics added.) The invitation for bids likewise underlined that "Following the public hearing before the Board of Supervisors on material pertaining to the bids, *all material pertaining to the award will be sent to the Department of Health,* State of California, *for final approval."* (Italics added.) County's own understanding that the social services contracts (including the homemaker and chore services agreements) are subject to State's approval is further demonstrated by the fact that in response to an inquiry County's attorney stated that *"It is advisable that* upon completion of *the* new *Bid Proposal Package* the same *be submitted to the State Department of Health* and any appropriate federal agency *for approval* and that approval be directed to your Department in writing." (Italics added.) Also, in a similar action (San Francisco Home Health Service v. State of California, action No. 717-372), County's purchasing agent acknowledged that the in-home supportive services contracts called for approval by State.[5] The above samples clearly indicate that all the parties to this lawsuit interpreted the

[5]The declaration filed in action No. 717-372, of which we take judicial notice pursuant to Evidence Code, section 452, subdivision (d), sets out in pertinent part that "because this contract [for the provision of in-home supportive services] is entirely funded by State and Federal funding sources and not any local monies, and because said process is subject to State and Federal law and regulations applicable to the State agency and the counties on this topic, that it would be impractical as Purchaser for me to make an award *without* the communication and *approval of the State-level agency* involved in the funding and supervision." (Italics added.)

applicable statutes and regulations to the effect that State had power to approve or disapprove the types of social services contracts involved in this case. ■ ■ It goes without saying that the construction of a statute or regulation by the officials charged with their administration is highly significant and entitled to great weight (*Nelson* v. *Dean* (1946) 27 Cal.2d 873 [168 P.2d 16, 168 A.L.R. 467]; 3 Sutherland, Statutory Construction (4th ed. 1974) § 65.05, p. 174).

In summary, we conclude that as a matter of statute, sound legal policy and the administrative interpretation of the statutory and regulatory provisions, State has the power to approve or disapprove the in-home supportive services contracts entered into between the counties and private individuals or entities pursuant to the Welfare and Institutions Code. The authority of State to disapprove the in-home supportive services agreements includes the special power to deny the funding of such contracts where the circumstances surrounding the contracts so indicate. Therefore, the next crucial issue awaiting determination is whether in the situation here present State was justified in denying the funding of the homemaker contract entered into by County.

In passing upon the question of justification, we attach special significance to the September 23, 1976, letter written by DOH to County. In that letter, the Director of DOH expressed his concern about the statewide cost of the homemaker and chore services and the equitable allocation of the limited resources available. The director pointed out that during two consecutive fiscal years San Francisco received one-third to one-half more funds for such services than the other California counties. In order to curtail the extravagant and lavish spending of the welfare funds on the part of County, the director advised County that effective December 1, 1976, State would reimburse San Francisco only up to $5.50 per hour for homemaker services and $4.84 per hour for chore services.[6]

---

[6]The September 23, 1976, letter reads in pertinent part as follows: "I am concerned for those in need of Homemaker or Chore services, as well as the welfare of the employees providing such services. I am also concerned about the costs of Homemaker/Chore services statewide and the equitable allocation of limited resources for services. I also am very conscious of the many demands for government services and the burden on the taxpayers. *In Fiscal Year 1975-76, San Francisco's allocation was $11.8 million, receiving 12.34 percent of the statewide allocation, while having only 6.79 percent of the statewide Homemaker/Chore workload. San Francisco currently receives a $12.5 million allocation for Homemaker/Chore services. Other counties with somewhat comparable workload and populations, and allowing for cost-of-living differences, are still allocated only one-third to one-half of the amount of money that San Francisco is receiving. Contract costs must be reduced.*

"More specifically, the Department of Health, in response to your appeal, will provide you with additional time before limiting reimbursement to San Francisco County. I

■ We believe that both the cost limitation set up by State and the disapproval of the homemaker service contract at issue must be held entirely reasonable and justified in light of the circumstances of the case. As we have pointed out, State has not only a right, but a statutory, mandatory duty, to determine the maximum allowable cost payable for the in-home supportive services contracts. Moreover, the figures ascertained as to San Francisco must be found not only reasonable, but generous indeed. As appears from the September 23, 1976, letter, the upper limit figures were arrived at by considering the special circumstances of San Francisco, and "The figures of $5.50 per hour and $4.84 per hour are 22 percent and 31 percent, respectively, above the statewide average hourly cost for contracted services of $4.51 and $3.69." At the same time it is undisputed that while the maximum allowable rate for the homemaker services in question was $6.05 per hour ($5.50 plus 10 percent), the contract in dispute adopted the joint bid which provided a rate of $7.71 per hour, well in excess of the authorized maximum hourly charge. Under these circumstances, State was not only justified, but directly mandated, to disapprove the contract at bench in order to prevent excesses and to ensure an equitable allocation of funds to all counties.

The foregoing discussion makes it unnecessary to engage ourselves in a lengthy discussion with respect to the remaining contentions raised on appeal. San Francisco's argument that State failed to discharge its statutory duty under section 12303, subdivision (a), because it did not determine the allowable cost of services statewide, may be briefly disposed of. ■ While the cited section provides that the allowable cost must be determined by DOH, nowhere does it appear that State must make a uniform determination of costs throughout the whole state,

would urge you to again attempt to renegotiate your present rates downward as soon as possible. However, absent a lower rate the State will reimburse your claims through November 30, 1976, based on your current contractual arrangements with the Homemaker/Chore agency providers.

"I am anticipating that San Francisco will meet the timetable previously approved by the Department of Health wherein new contractual arrangements will be in effect by December 1, 1976."

"*Should a State-approved, competitively bid contract not be in place by December 1, 1976, reimbursement from the State to San Francisco County will only be available for dollar amounts up to $5.50 per hour for Homemaker services and $4.84* per hour for Chore services."

"It is assumed that a successful process of competitive bidding will result in acceptable bids below these upper limit figures. If that should not prove to be the case, the State will need to carefully examine and analyze all of the cost components contributing to any recommended bid in excess of these amounts, with no advance assurance that we would find them approvable." (Italics added.)

nor is there any requirement that the determination must be made in any particular manner.

County's additional argument that the September 23, 1976, letter set up maximum rates only as to contracts entered into prior to December 1, 1976, and that there were no maximum charges as to homemaker and chore services contracts concluded after December 1, 1976, cannot be accepted for three simple reasons: One, the September 23, 1976, letter as a whole clearly conveys the idea that State wished to curtail County's spending, not only as to past, but also future contracts, i.e., agreements entered into subsequent to December 1, 1976. Two, Mr. Wilson[7] testified "That the $5.50 figure was considered by the Department to be a rate that was reasonable for the future, not just the present. That subsequent to December 1st, we believe that $5.50 was a reasonable rate." Three, the issue whether the disapproval of the contract was proper must be determined not only upon the September 23, 1976, letter, but upon the record as a whole. When so viewed, the record at hand convincingly demonstrates that the disapproval of the homemaker service contract in dispute was fully justified. County's last contention, that the regulations and/or directives of the state agency were in excess of State's statutory authority, requires just passing attention. For one thing, the Director of DOH has a statutory authorization to adopt regulations, orders or standards of general application to implement, interpret or make specific the law enforced by DOH (§ 10554.1). For another, as spelled out in detail above, State has an unquestionable right to approve or disapprove the in-home supportive services contracts. As a consequence, all the regulations or directives reaffirming that right must be held valid in their entirety.

In view of our conclusion, it is unnecessary to discuss State's alternative contention that the bidding process was improper. Suffice it to say, however, that our review of the record fails to find any evidentiary support for such an assertion.

The judgment (order) directing the issuance of a peremptory writ of mandate is reversed.

Taylor, P. J., and Rouse, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied February 21, 1979.

---

[7]Chief of the in-home supportive services Branch of DOH.