[Crim. No. 19803. First Dist., Div. Four. Sept. 12, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD GENE KLINE, Defendant and Appellant.

COUNSEL

William D. Farber, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, William D. Stein and Stan M. Helfman, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**KOFORD, J.**\*—Appellant Donald Gene Kline was charged by information with two counts of unlawful offer and sale of securities (Corp. Code, § 25110) and one count of unlawful offer and sale of a franchise

---

\*Assigned by the Chairperson of the Judicial Council.

(Corp. Code, § 31110). Kline pleaded not guilty to all counts and moved to dismiss the information (Pen. Code, § 995); the motion was granted as to one count of unlawful offer and sale of securities, and was otherwise denied.

At a nonjury trial appellant moved for judgment of acquittal (Pen. Code, § 1118) which was denied. The court found appellant guilty of both remaining counts and pronounced sentence reducing the offenses to misdemeanors. This appeal followed.

The two contentions on appeal are that appellant did not sell a "franchise" within the statutory definition, and that he should not have been convicted of an unlawful offer and sale of securities because he did not receive value for his offer to give securities. The facts can be summarized as follows:

In mid-1977 appellant formulated plans to establish a fast food chain which would sell hot dogs from portable kiosks under the name "Aunt Hilda's Pennsylvania Dutch Steamed Franks." He incorporated a company for this purpose, designated as National Food Service Marketing, Inc. The corporation was not registered to sell securities.

1. *As to the unlawful offer and sale of securities*

On September 14, 1977, an acquaintance, Christian de Nes, loaned appellant $2,000 to help start the business and an additional $7,000 on October 3, 1977. Appellant offered to give de Nes 100,000 shares of stock in National Food Service Marketing, Inc., if de Nes would build a prototype Aunt Hilda's kiosk, to which de Nes agreed.

Subsequently de Nes told appellant that he wanted to be given 1 million shares in the corporation, in place of 100,000 shares. Appellant offered 500,000 shares, and handwrote and signed an agreement, dated October 10, 1977, stating that he would give de Nes 500,000 shares of stock "when Mr. de Nes has provided the wherewithal and labor to construct and completely finish building the prototype kiosk for 'Aunt Hilda's Penn. Dutch Steamed Franks.'" Appellant was found guilty of violating Corporations Code section 25110 as to this transaction.

## 2. *As to the unlawful offer and sale of a franchise*

In June 1977, appellant had begun regularly to patronize a restaurant in Tiburon, where he met James Shaul and Caroline Mushet with whom he discussed his plans for the Aunt Hilda's Pennsylvania Dutch Steamed Franks enterprise. He told Mushet that he intended to build many kiosks for the enterprise, and showed her blueprints for the kiosks.

In November 1977, Shaul told Mushet that appellant "was offering a very good price for his franchises," and suggested that they become involved in the enterprise as partners, with Shaul as manager and Mushet as investor. On November 21, 1977, Shaul, Mushet, and appellant met at Shaul's apartment to discuss the enterprise. Appellant told Mushet that he was offering a franchise for $25,000 on a very short term basis, which he would soon sell for $40,000 and later would sell for $80,000. Shaul told Mushet that "it was a turn key operation." Mushet understood this to mean that "it was everything complete, ready to go, absolutely supplied and sustained and everything else." She was also told that the menu for the business "would be handled by an expert." She was given a "pro forma" outlining projected sales, operating expenses, payroll expenses, and profits for "Aunt Hilda's Pennsylvania Dutch Steamed Franks," and appellant handed Mushet a newspaper article about franchises and said that he was proposing a similar operation. She testified that, "as I understood it, he was going to have many many franchises. He was going to have a lot of Aunt Hilda's barns all over the place."

Mushet was not given specific details as to a marketing plan or system; both appellant and Shaul, however, told her that "everything would be supplied and managed and promoted by National Food Service Marketing." She understood that the day-to-day operation of the business was to be conducted by National Food Service Marketing, Inc., that there would be an ongoing relationship between appellant's corporation and her proposed partnership with Shaul, and that appellant was in complete control of the operation.

That very evening Mushet decided to enter into the proposed investment. Mushet and Shaul signed a handwritten "partnership agreement" drafted by appellant, in which Mushet agreed to invest $50,000 in the partnership for the purchase of at least two "Aunt Hilda's Kiosks' Business Opportunities." They also signed as partners a "purchase agree-

ment," also handwritten and drafted by appellant, to purchase two "Aunt Hilda's Kiosks' Business Opportunities" for $25,000 each from National Food Service Marketing, Inc.

Mushet gave appellant $50,000 in two installments (appellant later demanded more money from her, and on two occasions she loaned him funds totaling $15,000). Appellant was found guilty of violating Corporations Code section 31110 by the unlawful offer and sale of an unregistered franchise to Caroline Mushet.

A. *Did appellant sell or offer to sell an unregistered "franchise" within the meaning of Corporations Code sections 31005 and 31110?*

Appellant contends that the court erred when it denied motions to set aside the count for offer and sale of an unregistered franchise (per Pen. Code, § 995[1]) and for acquittal on that count at trial, because appellant did not sell or offer to sell a "franchise" as defined by Corporations Code section 31005. Corporations Code section 31110 provides that it is unlawful "to offer or sell any franchise in this state unless the offer of the franchise has been registered...or exempted...." Corporations Code section 31005 defines "franchise" in pertinent part as follows: "'Franchise' means a contract or agreement, either expressed or implied, whether oral or written, between two or more persons by which:

"(a) A franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor; and

"(b) The operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate; and

"(c) The franchisee is required to pay, directly or indirectly, a franchise fee."

---

[1] No transcript of the preliminary examination is included in the record; however this issue is subsumed by the basic question presented on appeal, as is review of the denial of a motion for acquittal. (Cf. *People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941].)

Appellant argues that the two "business opportunities" sold to the partnership formed by Shaul and Mushet did not as a matter of law constitute a franchise within the meaning of Corporations Code section 31005, subdivision (a), because there was no "marketing plan or system" and even if so, it was not "prescribed in substantial part by a franchisor."[2] The evidence which satisfied the trial court that whatever appellant was selling constituted a franchise was, says appellant, as a matter of law insufficient to meet the statutory definition. He argues that California has a more limited definition of "franchise" than other states with franchise registration laws, citing various articles on the subject, the "Guidelines for Determining Whether an Agreement constitutes a Franchise" issued by the Commissioner of Corporations (Release 3-F, revised, Feb. 21, 1974) and opinions of the Corporations Commissioner holding that various agreements submitted for registration did not constitute registerable franchises.

■ The "Guidelines," of course, are not exclusive and although the interpretation of a statute by the officials charged with its administration is entitled to great weight (*City and County of San Francisco* v. *State of California* (1978) 87 Cal.App.3d 959, 967 [151 Cal.Rptr. 469]), the final say on the meaning of a statute rests with the courts (*State Compensation Ins. Fund* v. *Workers' Comp. Appeals Bd.* (1979) 88 Cal.App.3d 43, 53-54 [152 Cal.Rptr. 153]). ■ We should ascertain the intent of the Legislature so as to effectuate the purpose of the law (*Tripp* v. *Swoap* (1976) 17 Cal.3d 671 [131 Cal.Rptr. 789, 552 P.2d 749]) and construe the statute with reference to the whole system of law of which it is a part (*People* v. *Weltsch* (1978) 84 Cal.App.3d 959 [149 Cal.Rptr. 112]).

Corporations Code section 31001 sets forth the legislative intent: "It is the intent of this law to provide each prospective franchisee with the information necessary to make an intelligent decision regarding franchises being offered. Further, it is the intent of this law to prohibit the sale of franchises where such sale would lead to fraud or a likelihood that the franchisor's promises would not be fulfilled, and to protect the franchisor by providing a better understanding of the relationship between the franchisor and franchisee with regard to their business relationship." ■ So long as there is a prescribed marketing plan or system in the agreement, one of the definitional elements of a registera-

---

[2]Appellant does not argue that there was no trade name or logo per subdivision (b) or that a fee was not paid per subdivision (c).

ble franchise is present. The "Guidelines" of the Commissioner of Corporations state: "If the franchisor in his advertising to prospective franchisees claims to have available a successful marketing plan, the element of a marketing plan presumably will be present. . . ."

The contract or agreement which constitutes a "franchise" by section 31005 may be expressed or implied, whether oral or written; hence the marketing plan itself may be expressed or implied, oral or written. In the case at bench there was a written contract binding the franchisor, National Food Service Marketing, Inc., appellant's corporation, to "total and continuing support" of the franchisee. Appellant had agreed orally to assist in advertising and to supply food and supplies and menu planning, etc., through his corporation. The use of identifiable and distinctive kiosks at least implied a prescribed marketing plan or system, and there was an expressed agreement to sell "Aunt Hilda's Pennsylvania Dutch Steamed Franks," surely an indication of a common marketing plan or system. Appellant also promised that there would be an operational plan which he had "pretty well worked out." He represented to a number of people that he was organizing a national food franchise similar to other well known and successful national franchises. The whole scheme was appellant's conception of an integrated operation prescribed and directed by him through National Food Service Marketing, Inc., his corporation. By phrasing his handwritten agreement in terms of sale of a "business opportunity"[3] appellant cannot avoid the requirement of registering this franchise sale.

There was therefore ample evidence from which the trial court could find all of the statutory elements of a franchise; as that court said: "The whole aroma, the whole atmosphere around this sale clearly related to the sale of other than just the kiosk. It was a sale, actually, of a franchise."

Appellant's argument that there must exist a fully prescribed and detailed marketing plan or system in order to meet the definition of a registerable franchise sale or offer is too narrow a statutory construction. The Legislature expressed concern for the protection of prospective franchisees in enacting the Franchise Investment Law (Corp. Code, § 31001). In fact the specified intent of the law was to prevent just such

---

[3]It is doubtful that the sale in question was of a "business opportunity." See Business and Professions Code section 10030 defining "business opportunity" as the sale or lease "of the business and goodwill of an existing business enterprise or opportunity."

a sale as made by appellant, where the seller's failure to provide full information "would lead to fraud or a likelihood that the franchisor's promises would not be fulfilled." Therefore it is not appropriate to construe the definition of Corporations Code section 31005 as limiting the proscription of section 31110 to fully developed franchise schemes. A sale for a fee of a business substantially associated with the seller's trademark, service mark, trade name, logotype, advertising or other commercial symbol, which the seller represents *will constitute* a franchise and will include a marketing plan or system *to be* prescribed in substantial part by the seller is the unlawful sale of an unregistered franchise.

Moreover, nothing in sections 31005 or 31110 indicates that the Legislature intended an agreement to be considered a franchise, and thus subject to the registration provisions, *only* if the seller has fully prescribed a promised marketing plan or system *prior* to an offer or sale. To the contrary, if the Franchise Investment Law were so construed, a franchisor could circumvent the registration provisions by selling or offering to sell a franchise but omitting to prescribe a promised marketing plan or system until *after* the sale.

Appellant's contention that a broad construction of the Franchise Investment Law will jeopardize the state's control over securities through the Corporate Securities Law (Corp. Code, § 25000 et seq.) is beside the point. The relatively rare instances of protection for prospective franchisees through the Corporate Securities Law prompted the Legislature to exempt franchises from that law and by enactment of the Franchise Investment Law subject them to more appropriate and complete regulation.[4] The narrow construction urged by appellant could enable a clever seller of an intended franchise to escape regulation under either the Franchise Investment Law or the Corporate Securities Law, contrary to the legislative purpose.

---

[4]Corporations Code section 31001 states: "The Legislature hereby finds and declares that the widespread sale of franchises is a relatively new form of business which has created numerous problems both from an investment and a business point of view in the State of California. Prior to the enactment of this division, the sale of franchises was regulated only to the limited extent to which the Corporate Securities Law of 1968 applied to such transactions. California franchises have suffered substantial losses where the franchisor or his representative has not provided full and complete information regarding the franchisor-franchisee relationship, the details of the contract between franchisor and franchisee, and the prior business experience of the franchisor." (See also Corp. Code, § 25019.)

B. *Did appellant sell or attempt to sell unregistered securities?*

Appellant challenges the sufficiency of the evidence to support his conviction for violation of Corporations Code section 25110. That section provides that "It is unlawful for any person to offer or sell in this state any security...unless such sale has been qualified...or... exempted." Corporations Code section 25017 defines such a sale as including "every contract of sale of, contract to sell, or disposition of, a security or interest in a security *for value*," and defines such an offer as including "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value." (Italics added.)

█ Appellant asserts that as of October 10, 1977, when he wrote the agreement to give de Nes 500,000 shares of National Food Service Marketing, Inc., "when Mr. de Nes has provided the wherewithal and labor to construct and completely finish building the prototype kiosk," nothing of value passed to him in exchange for his promise. Appellant seems to believe that the unilateral promise to convey stock when de Nes finished the kiosk was not a violation of section 25110. Such is not the case.

Regardless of whether anything of value actually passed from de Nes to appellant on October 10, 1977, the writing signed by appellant on that date constituted an offer to sell securities within the meaning of Corporations Code section 25017. That the offer was not accepted by full performance (Civ. Code, § 1584) is not controlling. Actual transfer of consideration is not necessary to constitute an unlawful offer to sell securities. (*Ogier* v. *Pac. Oil and Gas Development Corp.* (1955) 135 Cal.App.2d 776, 779 [288 P.2d 101].) The finding that appellant violated section 25110 is supported by substantial evidence of an offer to sell unregistered securities.

The judgment is affirmed.

Caldecott, P. J., and Poché, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 5, 1980.