[No. A055586. First Dist., Div. Four. Nov. 10, 1992.]

AGNES Y. KIM, Plaintiff and Appellant, v.
SERVOSNAX, INC., Defendant and Appellant.

## COUNSEL

M. Van Smith for Plaintiff and Appellant.

Vincent M. Spohn and James L. McIntosh for Defendant and Appellant.

## OPINION

**ANDERSON, P. J.**—This appeal and cross-appeal raise issues concerning the Franchise Investment Law (Corp. Code,[1] § 31000 et seq.), the Cartwright Act (Bus. & Prof. Code, § 16720 et seq.) and related matters. In July 1986 plaintiff and appellant Agnes Y. Kim sued defendant and appellant Servosnax, Inc. (Servo), alleging, among others, causes of action for breach of contract, violation of the Franchise Investment Law and violation of the Cartwright Act. The trial court nonsuited Kim on her Cartwright Act claim; the two remaining causes of action went to the jury. The jury delivered a

---

[1]Unless otherwise indicated, all statutory references are to the Corporations Code.

verdict in favor of Kim on her cause of action for violation of the Franchise Investment Law, awarding damages in the amount of $45,000. Thereafter Servo moved unsuccessfully for a new trial. We conclude there were no errors below and affirm the judgment.

## I. FACTS

### A. *Servo's Business in General*

Servo is a California corporation which contracts with owners and managers of office complexes to operate food dispensing facilities, typically cafeterias, on site. Servo builds out the cafeteria space, purchases and installs the equipment, opens the cafeteria for business, and then operates it for a period of four to eight weeks.

Servo then licenses the right to operate the cafeteria to an individual operator, pursuant to a license agreement. The operator pays a fee for the license, typically a cash down payment for half the purchase price, with the remainder carried back by Servo on a promissory note. Additionally, Servo charges the operator a monthly fee equal to 10 percent of the net sales.

After the new operator is in place, Servo stays on the premises for a short training period. Thereafter, Servo acts as a liaison between the location owner or manager and the licensee, and makes routine inspection visits to ensure quality standards are maintained. Servo controls the menu and pricing for its cafeteria operations. It requires its operators to provide a hot entree, hot soup and sandwiches on a daily basis.

There was no name, logo or symbol identifying the cafeteria with Servo. In fact, licensees were not permitted to use Servo's name or any derivative thereof in the operation of the cafeteria. Servo does not register its license agreements as franchises under the Franchise Investment Law.

### B. *Servo's Agreement With Kim*

In July 1982, Mr. and Mrs. Kyung Ja Kim entered into a license agreement with Servo to operate an employee cafeteria located at Nicolet Magnetics Corporation in Fremont. The agreement was for a five-year term; the purchase price was $35,000. Nearly three years into the term, in April 1985, the original licensees sold and transferred their license to Agnes Kim for $33,000. She paid $24,000 in cash and gave Servo a promissory note for $9,000.

At the end of June or beginning of July, cafeteria sales dropped because Nicolet began laying people off; that fall, Nicolet announced it would close the cafeteria.

In January 1986, Mr. Goodroe, vice-president of Servo, visited the Nicolet cafeteria and informed Kim that the cafeteria would be closed. He considered the extensive layoffs to be a "loss of location" under the agreement, and set January 14, 1986, as the date her location was lost. The "loss of location" provisions provide that if the location owner terminates the right of possession of the licensed premises within the five-year period, Servo, at its option, can either provide the licensee "another location of comparable income within ninety (90) days" or partially refund the purchase price according to an established schedule that reduces the payout for each year of operation under the agreement.

Servo chose to offer Kim the location replacement remedy. Kim consulted with an attorney who prepared a letter agreement which expressed that: (1) Servo would provide Kim a new location within 90 days of January 14, 1986; (2) if Kim rejected the initial location offered, Servo would continue to seek another location, but at that point it would not be bound by the 90-day period; and (3) Servo would consider replacement options of greater than comparable income, providing Kim would pay an additional fee. Goodroe executed this letter agreement on behalf of Servo.

Within 90 days, Goodroe notified Kim that 2 other employee cafeterias were available that the company considered comparable. One was in San Ramon, the other in Livermore. Goodroe testified that Kim expressed that these locations were "too far away."[2] Ross was a large facility with a complex configuration and a tight shift schedule for serving up approximately 500 employees. Goodroe testified he told Kim the Ross facility was not suitable for her; he did not offer her the Ross license because she did not have the experience to operate that cafeteria.[3]

The Sun location was under construction and not yet occupied. Its potential employee base of 500 was greater than that at Nicolet. Kim testified Goodroe offered her Sun at no extra cost; Goodroe stated that after they visited the site, he told her he would have to review the move-in schedules before figuring a price. On April 22 Goodroe offered Kim the Sun location for $12,000 on a 50 percent down payment plus a five-year note at 12 percent, or $10,000 in cash. Goodroe explained in court that this offer would

---

[2]Kim testified that at the January meeting, she told Goodroe that she wanted a location about the same distance from her home as Nicolet. According to Kim, Goodroe responded at that time that Servo "usually provided the location close to the location [the] operator used to own" and he would try to do the same for her. Because of this commitment, she did not consider a more distant location to be an offer.

[3]Kim testified that she and Goodroe discussed the Ross location before the site visit; that he told her she would have to pay more for the operation because it was larger than Nicolet; they discussed value and price; and she agreed to pay the difference.

be based on the existing term of the Nicolet license, which was four years old. In reality Kim would be paying $12,000 for the opportunity to run Sun for one year, and she still had to pay $8,000 on the promissory note to Servo.

The parties negotiated over the Sun location and explored the cost of a new, five-year license there, but never reached agreement. They disagreed principally on the formula for crediting Kim for her Nicolet license. Servo offered Kim an additional location which she rejected.

## II. APPEAL

Servo urges that we reverse the judgment awarding Kim $45,000 in damages based on Servo's violation of the Franchise Investment Law. A "franchise" is a contract by which: "(1) A franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor; and [¶] (2) The operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name,[4] logotype, advertising or other commercial symbol designating the franchisor or its affiliate; and [¶] (3) The franchisee is required to pay, directly or indirectly, a franchise fee." (§ 31005, subd. (a).)

In California, the sale of franchises is regulated. Subject to certain exceptions not germane to this appeal, the franchisor must register the sale of a franchise with the Commissioner of Corporations (hereafter Commissioner) (§ 31110 et seq.) and must provide the prospective franchisee with a proposed offering circular enumerating material information set forth in the application for registration (§§ 31114, 31119).

At the operative times, a franchisor had to disclose, among other things, the franchise fee charged and the "formula by which the amount of the fee is determined if the fee is not the same in all cases" as well as the conditions under which the franchise could be terminated, or its renewal could be refused.[5] Any person who sells a franchise without registering it or delivering the offering circular to the prospective franchisee is liable to the franchisee, who in turn may sue the franchisor for damages caused thereby. (§ 31300.)

---

[4]Goodroe testified that Servo did not use its corporate name, but rather used "Servo Food Systems" as its "doing business name.". A trade name is a "word, name, symbol, device or any combination thereof" used by a person to identify his or her business and distinguish it from the business of others. (Bus. & Prof. Code, § 14208.) The court instructed the jury on the definition of trade name. We conclude "Servo Food Systems" was a trade name within the meaning of this statute.

[5](§ 31111, subds. (i), (k), added by Stats. 1970, ch. 1400, § 3, p. 2649, prior to the 1989 amendment.) The Legislature amended section 31111 again in 1989, replacing the laundry list

Kim's theory was that (1) Servo's license agreements were franchises; (2) Servo did not register its franchises or provide prospective franchisees with an offering circular revealing material information about the franchise; and (3) had she known how Servo valued the Nicolet license and the conditions for terminating or not renewing if there was a loss of location, she would not have purchased the license from Kyung Kim.

■ In order to prove a statutory violation, Kim of course initially had to establish that the license agreement was a franchise within the meaning of section 31005. Servo agrees that the first and third elements of a franchise were met but contends as a matter of law that the second element requiring "substantial association" with the franchisor's name or symbol could not be established, and that the court's instructions to the jury on this point were erroneous.

As Servo accurately points out, the code does not define the concept of "substantial association." Nor have we discovered any reported decisions on target. As did the court in this case, we thus also look to guidelines and opinions issued by the Commissioner for further insight. However, we are mindful that although interpretation of a statute by the officials charged with its administration is entitled to great weight, the courts have the final say on the meaning of a statute. (*People* v. *Kline* (1980) 110 Cal.App.3d 587, 593 [168 Cal.Rptr. 185], construing § 31005.)

In the Guidelines for Determining Whether an Agreement Constitutes a "Franchise" issued by the Commissioner (release No. 3-F, rev. Feb. 21, 1974 [hereafter Guidelines]), the Commissioner explains that the objective of the law is to deal with a multiplicity of business establishments presented to the public as a unit or marketing concept operated pursuant to a uniform marketing plan under coverage of a common symbol. (Guidelines, at p. 6.) In line with that objective, "for the operation of the franchisee's business to be substantially associated with the symbol, it must be communicated to the customers of the franchisee." (*Ibid.*)

The court delivered the following instructions: "In order to find that there was a franchise, you must decide if the operation of the business of the plaintiff was substantially associated with defendant's trademark, service mark, trade name, logotype, advertising or other commercial symbol. [¶] In deciding whether there was such an association, you must consider whether customers served by the plaintiff, including the companies for whom the

of application items for the single requirement that the application shall be filed on the Uniform Franchise Registration Application. (Stats. 1989, ch. 1026, § 4.)

plaintiff and defendant provided cafeterias, associated the operation of the cafeteria by plaintiff with the defendant's trademark, service mark, trade name, logotype, advertising, or other commercial symbol."[6]

In fashioning this instruction, the court relied in part on a synopsis of an opinion letter issued by the Commissioner which delved into whether an arrangement similar to that between Servo and its licensees constituted a franchise. The pertinent facts narrated in Commissioner's Opinion No. 74/7F, issued May 3, 1974, are as follows: Jay-Rock obtains service contracts with industrial and manufacturing plants setting forth the commitment of Jay-Rock and the plant to install an in-plant food servicing unit for plant employees, which Jay-Rock will then purchase. Jay-Rock advertises for an owner/operator to purchase the servicing unit and operate it in the particular plant. With the consent of the plant, Jay-Rock then assigns the service contract to the owner/operator. Title to the food service unit vests in the owner/operator upon making the initial down payment. Jay-Rock takes back a promissory note secured by the equipment in the unit. The owner/operator also pays a monthly service charge based on the number of employees in the particular plant. The owner/operator also agrees to purchase exclusively from Jay-Rock those food items which Jay-Rock manufactures, processes and delivers. This amounts to 30 percent of the dollar amount of products purchased by the owner/operator. If the plant cancels the service contract, Jay-Rock must repurchase the unit and reimburse the owner/operator based on a predetermined depreciation schedule.

The Commissioner found this arrangement to be a franchise. As to the issue of whether the business of the owner/operator was substantially associated with the commercial symbol of Jay-Rock, the Commissioner reiterated that the commercial symbol must be communicated to the customers of the franchisee. "In this connection, it is our opinion that the various plants with which Jay-Rock enters into Service Contracts, which are later assigned

---

[6]Servo proposed the following instruction, which the court refused to deliver: "You must decide whether or not Plaintiff operated her business in substantial association with Defendant's trademark, service mark, trade name, logotype, advertising, or other commercial symbol, and whether or not it designated Defendant as the source of the goods or services offered by Plaintiff. To decide this question, you must determine whether Defendant granted Plaintiff the authority to use trademark, service mark, trade name, logotype, advertising or other commercial symbol for commercial purposes. Then you must also decide if trademark, service mark, trade name, logotype, advertising, or other commercial symbol was communicated to customers enough, so that they would regard the business as one outlet in a chain associated with Defendant. Plaintiff's business could only be substantially associated with Defendant's commercial symbol if it was communicated to customers in association with the offer or sale of the goods or services."

This instruction was patterned after CALJIC No. 24.06. (2 Wells & Pearlman, Cal. Forms Jury Instructions (1992) p. 24-24.)

to owner/operators, are 'customers' of owner/operators to whom the name 'Jay-Rock Sales, Inc.' is communicated. Moreover, you have represented that the food articles may have a 'stick-on label which identifies the food and contains' Jay-Rock's name. Thus Jay-Rock's commercial symbol is communicated to the employees purchasing food from the owner/operator, who, in our opinion, are also customers of owner/operator." (Commissioner's Opn., No. 74/7F.)

There are differences between the Jay-Rock scheme and the Servo schemes, but there are also some significant similarities. In particular, there are two levels of customers in both situations. Although in the Jay-Rock case the owner/operator actually owned the food service unit and was the assignee of Jay-Rock on the service contract with the host company, we do not think these features transform the fundamental franchisor-franchisee relationship. Servosnax in effect delivered a captive umbrella customer to the licensee. The licensee, while not the owner of the cafeteria, had the exclusive right to occupy and operate the food business at the specified location. And at this customer level, Goodroe acknowledged that Servo was "associated with the operation of the cafeteria." Servo provided the food services to Nicolet through the vehicle of a licensee, "and that was apparent to everyone in the transaction." Moreover, Steve Mohr, the Nicolet executive who negotiated the initial food services contract with Servo, testified that he associated the operation of the cafeteria and the price list for the various food items with Servo. He was attracted to Servo because of its flexibility and the complete menu it offered.

The Servo situation differs from that of Jay-Rock, however, when it comes to the second level of customers, namely the actual patrons of the food service facility. In our case, the licensees were prohibited from using the name "Servo Food Systems" or any derivative[7]; in the former situation, Jay-Rock's symbol was communicated to the employees frequenting the service unit through labels which appeared on food items provided by it.

■ Our job in determining the meaning of a statute starts with ascertaining the intent of the Legislature so as to effect the purpose of the law and construe the statute with reference to the entire law of which it is a part. (*People* v. *Kline, supra,* 110 Cal.App.3d at p. 593.) In enacting the Franchise Investment Law, the Legislature declared its concern for protecting prospective franchisees and expressed its intent to prevent franchise sales where it is

---

[7]Mohr also explained that one of the reasons Nicolet chose Servo was because his company did not want the public to associate the cafeteria with an institution. "We wanted it to look like it was our own cafeteria. [¶] It didn't have an institutional feel. That's what we were looking for."

likely that the franchisor's promises would not be fulfilled. (§ 31001;[8] *People* v. *Kline, supra,* 110 Cal.App.3d at pp. 594-595.)

■ As a general matter, remedial or protective statutes such as the Franchise Investment law are liberally construed to effect their object and quell the mischief at which they are directed. (*California State Restaurant Assn.* v. *Whitlow* (1976) 58 Cal.App.3d 340, 347 [129 Cal.Rptr. 824]; *Alford* v. *Pierno* (1972) 27 Cal.App.3d 682, 688 [104 Cal.Rptr. 110].) With regard to the statutory definition of "franchise," this means each element should be construed liberally to broaden the group of investors protected by the law and to carry out the legislative intent.

■ In light of these principles, we conclude that host companies such as Nicolet are customers of the licensees to whom the name of the franchisor is communicated and thus the licensee's operation of the cafeteria or other food service enterprise is substantially associated with Servo's name.

Of course when the franchisor's name or symbol is communicated to the customers, it is not the naked name, alone, that is conveyed. Rather, it is the franchisor's goodwill and reputation which is being communicated. This is the key. To the person investing in a franchise, the value of the franchise is the association of the franchisee's business operation with the goodwill and reputation of the franchisor. Indeed it was precisely this beneficial association with Servo's reputation that Servo sold to its licensees.[9]

---

[8]Section 31001 states: "The Legislature hereby finds and declares that the widespread sale of franchises is a relatively new form of business which has created numerous problems both from an investment and a business point of view in the State of California. Prior to the enactment of this division, the sale of franchises was regulated only to the limited extent to which the Corporate Securities Law of 1968 applied to such transactions. California franchisees have suffered substantial losses where the franchisor or his representative has not provided full and complete information regarding the franchisor-franchisee relationship, the details of the contract between franchisor and franchisee, and the prior business experience of the franchisor. [¶] It is the intent of this law to provide each prospective franchisee with the information necessary to make an intelligent decision regarding franchises being offered. Further, it is the intent of this law to prohibit the sale of franchises where such sale would lead to fraud or a likelihood that the franchisor's promises would not be fulfilled, and to protect the franchisor by providing a better understanding of the relationship between the franchisor and franchisee with regard to their business relationship."

[9]The license agreement specifically recited: "WHEREAS, Licensor has developed over the course of several years a high degree of expertise in locating and contracting with various . . . ('Location Owners') for the occupation and operation of food dispensing facilities and has established fruitful relationships with such Location Owners as well as provisioners of foodstuffs and suppliers of equipment and related services, and consequently has developed significant and valuable goodwill, and [¶] Whereas, Licensor also has expended time, effort and money to develop know-how and operating expertise in the promotion of the sale of food at retail, and has successfully established a unique form of operation which has also created

Similarly, Servo acknowledged that its goodwill and reputation were selling points in marketing itself to host employers. In our unique situation, with a captive employee cafeteria, no one but the licensee can operate the facility or sell or serve meals there. Servo commits to the host employer that it will cause at least "one of its employees, or persons with whom Servo has contracted for the conduct of the food business, to attend the Servo unit." Therefore, the key association with the name and goodwill of Servo occurs in the selection process when a host employer such as Nicolet selects Servo from among other competitors to set up the facility and provide an operator to run it. This person, the franchisee, thus is intimately associated with Servo in the mind of the location owner. It is this association that benefits the franchisee, who then operates the facility pursuant to a license agreement.

Citing various Commissioner opinions and the Guidelines, Servo contends the court erred in not instructing the jury that it must determine (1) whether Servo granted Kim the authority to use its trade name or symbol;[10] (2) whether "it" designated Servo as the source of the goods or services offered by Kim; and (3) whether the trade name or symbol "was communicated to customers enough, so that they would regard the business as one outlet in a chain associated with [Servo]." Finally, Servo argues the jury should also have been instructed that: "Plaintiff's business could only be substantially associated with Defendant's commercial symbol if it was communicated to customers in association with the offer or sale of the goods or services."

We observe first that although a specific grant of authority to use Servo's name would be conclusive on the "substantial association" issue, it does not speak to the complexity of the situation present here: namely, although Kim could not use Servo's name with the employees, Servo indeed used its own trade name with Nicolet, the first tier customer.[11]

---

significant and valuable demand and goodwill, and [¶] WHEREAS, Licensee desires to benefit from Licensor's knowhow, expertise and goodwill and to occupy and operate the Food Facility . . . ."

[10]In particular, Servo draws attention to the following statements in the Guidelines: "[I]f the franchisee is granted the right to use the franchisor's symbol, the franchise concept is satisfied, even if he is not obligated to display the symbol . . . . [¶] A commercial symbol which a supplier of goods or services only uses on his invoices or in his advertising to distributors but which he does not permit the distributors to show in dealing with their customers, is not in the eyes of the public substantially associated with the operation of the supplier . . . ." (Guidelines, at p. 6.)

[11]We are mindful that the Commissioner has stated that agreements between a company and its consultants are not franchises where the companies did not grant the consultants the right to use its name or mark, assuming that the consultants do not communicate any symbol of the company to their clients. (Cal. Dept. Corp. Opn., No. 72/27F, p. 2.) This again does not contemplate the two-tiered customer structure we have in the food servicing unit situation.

Next, the second instruction requested is ambiguous, because the referent "it" is undefined. In any event, the host companies did view Servo as the master source of the food service unit operated by the licensee.

In the same vein, Servo's trade name was communicated to the host company such as Nicolet through (1) billings for catering services provided by the licensee/operator; (2) its contract with Servo; and (3) correspondence about cafeteria items and prices and the performance of licensees. And while the company would not be able to physically identify another Servo unit in another building because licensees could not display the trade name, conceptually the companies knew they were becoming involved with a service model that was replicated time and again in other locations.

Finally, the opinions that Servo cites for the proposition that the symbol must be communicated to customers in association with the offer or sale of goods or services simply do not make such an absolute statement. (Cal. Dept. Corp. Opn., Nos. 82/1F, p. 4, 73/5F, 73/35F, p. 2.) Moreover such a requirement would go against the notion that the franchise concept is satisfied by the mere grant of the right to use the symbol, even if the franchisee chooses not to display it. (See Guidelines at p. 6.) In any event, Servo's name would be communicated to the host companies in connection with the offer of its services.

### III. CROSS-APPEAL

### A. *Attorney Fees*

██ Kim first insists she is entitled to attorney fees as the party prevailing on a contract providing for recovery of fees. (Civ. Code, § 1717.) The license agreement, she points out, provides that in case of action to enforce any promise in the contract or for breach, the prevailing party would be entitled to recover reasonable attorney fees. She contends that an action for violation of the Franchise Investment Law is on the contract because it enforced the contract. It did not.

Kim received damages for the sole reason that Servo did not (1) register the license agreement with the Commissioner, or (2) provide disclosures to the prospective licensee about the business opportunity. The agreement did not call for either of these actions. The Franchise Investment Law does not provide for attorney fees and neither does Civil Code section 1717.

The cases Kim cites are inapposite. In *Shadoan* v. *World Savings & Loan Assn.* (1990) 219 Cal.App.3d 97 [268 Cal.Rptr. 207], plaintiff borrowers

sought to enjoin defendant financial institution from collecting prepayment penalties from others and to recover the penalties they themselves had paid. The court sustained defendant's demurrer, dismissed the complaint and granted defendant a portion of its attorney fees. The reviewing court affirmed, noting that restitution was one form of relief sought by borrowers on grounds the prepayment clause was unconscionable and thus part of an unfair business practice. (*Id.*, at pp. 107-108.) The court reasoned that the adjudication involved determining whether provisions of the underlying loan agreement were enforceable and thus the action in fact was one to enforce, or avoid enforcement of, the specific contract. (*Id.*, at p. 108.) By way of contrast, Kim's action did not have to do with enforcement. Rather, she sought damages for breach of responsibilities thrust upon franchisors by public law, not by private agreement.

In *South Bay Transportation Co.* v. *Gordon Sand Co.* (1988) 206 Cal.App.3d 650 [253 Cal.Rptr. 753], the court awarded attorney fees in an action to recover undercharges for hauling sand. The amount of the charges was set by tariff regulation. On appeal the court found the undercharge action essentially was on the contract because (1) the substantive right of action stemmed from the hauling services pursuant to the agreement; (2) the law, by fixing the rates, merely determined the amount of liability created by agreement of the parties; and (3) the parties are deemed to have contracted with such rate provisions in mind. (*Id.*, at pp. 660-661.) There was no such interplay here between the Franchise Investment Law and the parties' agreement.

Kim also argues that the license agreement can be construed as providing for attorney fees under a tort theory of recovery. The clause states: "In case any action shall be brought . . . to enforce any promise or covenant herein contained, or for damages in the case of breach by either party, the prevailing party shall be entitled to recover reasonable attorney's fees from the other party."

Kim asserts the "wording is ambiguous on what was intended by the word 'breach.' " Kim ignores the context in which the term breach appears. In context, the breach by either party can only refer to breach of the license agreement.

## B. *Cartwright Act Claim*

Kim next maintains that the trial court erred in nonsuiting her claim for violation of the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.). She specifically refers us to section 16720 of the Business and Professions Code

which defines a trust as "a combination of capital, skill or acts by two or more persons for any of the following purposes: [¶] (c) To prevent competition in . . . sale or purchase of merchandise, produce or any commodity." Except as otherwise permitted under the act, every trust is "unlawful, against public policy and void." (Bus. & Prof. Code, § 16726.)

Kim's theory is that Servo and Nicolet had an illegal tying agreement linking Servo's agreement to provide cafeteria services to Nicolet's agreement not to purchase commodities sold in the cafeteria from any other person or entity.[12]

During her tenure at Nicolet, Kim attempted to compete for the coffee concession in the Nicolet facility. Servo paid Kim $50 per month to deliver coffee to 11 stations in the 2 buildings served by the cafeteria. Apparently she delivered boxes of individual packs of coffee, as well as creamer, sugar, hot chocolate, tea, cups and stirrers. Kim proposed to a Nicolet executive that she could provide coffee to the company for less per month than Servo charged. Representatives of both Servo and Nicolet ultimately told her Servo had the exclusive right to sell coffee.

The court granted Servo's motion for nonsuit on the basis that the Cartwright Act did not apply to "such a narrowly circumscribed economic transaction." Under the Servo-Nicolet agreement, the restraint on trade, if any was limited to the ebb and flow of commerce in the cafeteria area. The agreement offered into evidence did not prohibit others from selling in other portions of the building.[13] Servo and Nicolet apparently interpreted the agreement as giving Servo the exclusive right to sell coffee, when in fact it did not.

In any event, even if there were a separate agreement permitting only Servo to sell coffee, such an agreement would not violate the Cartwright Act. ■ A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* (1971) 4 Cal.3d 842, 856 [94 Cal.Rptr. 785, 484 P.2d 953].) "Tying arrangements are illegal per se 'whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product' [citations] and when 'a total amount of

---

[12]The Servo-Nicolet agreement provided: "During the terms hereof, Second Party [Nicolet] shall not permit any other person or entity to sell the same or similar items of food or drink, etc., in the area designated 'CAFETERIA.' "

[13]Nicolet changed the standard terms, which applied the prohibition to "the building and surrounding areas" to "in the area designated 'CAFETERIA.' "

business, substantial enough in terms of dollar-volume so as not to be merely *de minimis*, is foreclosed to competitors by the tie. . . .' " (*Ibid.*; *People* v. *National Association of Realtors* (1984) 155 Cal.App.3d 578, 583 [202 Cal.Rptr. 243].) Kim offered no proof of Servo's market share of the food service industry (the purported "tying" product), no proof of the relevant geographic market for the tied product (coffee) and no proof of anything other than a de minimis foreclosure of business to competitors. Thus, there was a failure of proof of a per se violation.

 The Servo-Nicolet agreement of course did involve some restraint on trade because it prohibited others from selling in the cafeteria. Since the Cartwright Act only prohibits unreasonable restraints of trade (*Marin County Bd. of Realtors, Inc.* v. *Palsson* (1976) 16 Cal.3d 920, 930 [130 Cal.Rptr. 1, 549 P.2d 833]), the next question is whether the restraint here was unreasonable. As a matter of law it was not. In deciding whether restrictions are reasonable, courts ordinarily " '. . . consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be obtained, are all relevant facts.' [Citation.] The court should consider 'the percentage of business controlled, the strength of the remaining competition [and] whether the action springs from business requirements or purpose to monopolize. . . .' " (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.*, *supra*, 4 Cal.3d at p. 854.)

 Because the actual market affected by the purported agreement was so narrow, there was not, nor could there be, any proof that the agreement impacted the food service business in general. Moreover, as to the "history" of the restraint, it is clear that overall the agreement benefited not only Servo but licensees such as Kim who received $50 a month for providing the service. These are not evil ends nor is the purpose to monopolize the industry. Further, there was no proof of the percentage of the food service or coffee business controlled by Servo, or the strength of its competitors. Any exclusive agreement between Nicolet and Servo about the coffee concession had a de minimis impact on the relevant market, provided some benefit to the licensee, did not promote monopolization of the relevant industry and at most cut Kim out of competing with her own licensor for what she estimated would result in a profit of $100 per month.

## C. Contract Action

Kim finally complains that the court erred in delivering instructions on "meeting of the minds"[14] in connection with her contract cause of action. Kim's main theory was that Servo breached its contract with her by not providing her the Ross license. She reasons the instructions were erroneous and prejudicial for the following reasons: the "meeting of the minds" concept goes to formation of a contract and its resulting certainty; here, there was no issue of contract formation: the license agreement, as modified by the January 1986 letter agreement, was the contract in question, and it was not uncertain; moreover, the instructions were misleading and prejudicial because they permitted the jury to think that the parties had to agree on performance—i.e., agree on the Ross location—before there could be a breach of the modified contract.

Whether these instructions were proper or not, they were not prejudicial. First, it is clear, from the context and content of the instructions, that the "meeting of the minds" or mutual assent element went to contract formation, not breach. The jury *found* that Kim and Servo entered a contract, that Kim performed or was excused from performing, but that Servo did not breach that contract. Therefore, the instructions if anything were superfluous but not harmful.

Second, the purported modification, stated it was understood "that locations of greater comparable income will be considered provided Mrs. Kim is willing to pay more." Without question Ross was a location that would produce greater income than Nicolet. In essence the modification left determination of the alternative location to future agreement or determination and, thus, there was an issue as to enforceability of the modified contract. Again, the jury determined it was enforceable but there was no breach.

Third, Kim contends that if certainty as to comparable locations were an issue, then the contract was sufficiently certain on this point "because there was a formula for evaluating cafeterias." In this regard, Kim also requested the court to instruct in the language of BAJI No. 10.66 that although an essential term is uncertain, if the contract provides a means or formula for

---

[14]The court instructed: "To be enforceable, a contract must consist of material terms which are sufficiently definite so that the respective duties of the parties can be determined. [¶] An uncertain contract is unenforceable. A contract requires a meeting of the minds on the essential elements of the agreement, and a legal obligation does not arise if an essential element is reserved for future agreement. [¶] For a contract to be formed, there must be a meeting of the minds of the contracting parties. Mutual assent is necessary to all material terms. [¶] There is no meeting of the minds of the parties to the contract while they are still negotiating material terms."

determining the term, the contract is enforceable. (BAJI No. 10.66 (1990 new) (7th ed. pocket pt.) p. 247.) Although there was evidence at trial about how to evaluate locations, nothing in the license agreement or the January 17, 1986, letter provides a scintilla of a clue about how one determines if a location is one of comparable or greater than comparable income. Instruction in BAJI No. 10.66 would have been improper. And in any event, the problem with the Ross location was not valuation, but the licensee's experience and qualifications to handle a larger and more complicated operation.

We affirm the judgment in its entirety. Each party shall bear its own costs on appeal.

Poché J., and Reardon, J., concurred.