[S. F. No. 14637. In Bank.—September 27, 1932.]

## DEPARTMENT OF NATURAL RESOURCES OF THE STATE OF CALIFORNIA, DIVISION OF FISH AND GAME, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and JOSEPH L. MEANS, Respondents.

Eugene D. Bennett and Ralph W. Scott for Petitioner.

A. I. Townsend for Respondent Industrial Accident Commission.

THE COURT.—Petitioner, the Department of Natural Resources of the State of California, Division of Fish and Game, seeks by this *certiorari* proceeding to annul an award of the Industrial Accident Commission, directing petitioner to pay compensation to one Joseph L. Means. The basis of the award is that at the time the injuries complained of were received Means was an employee of petitioner, working in the course and scope of his employment. No question as to the extent of the injuries or the amount of compensation is presented in this proceeding.

Petitioner is a department of the state government (Pol. Code, sec. 373) and for the purposes of administration is organized into divisions, one of which is the Division of Fish and Game. (Pol. Code, sec. 373a.)

The facts giving rise to this controversy are not materially in dispute, and are as follows:

One Mabel Kayser desired to commercially seine Ellis Lake, located within the city limits of Marysville, for carp and other commercial or "rough" fish. Her divorced husband, who admittedly at all times was acting as her agent, approached the mayor and members of the city council of

Marysville, and secured their consent to seining the lake provided a permit was secured from the Division of Fish and Game. Mr. Kayser thereupon secured from the Division of Fish and Game, through N. B. Scofield, chief of the bureau of commercial fisheries, a permit running to the city manager of Marysville to "use nets for the purpose of removing carp and other rough fish from Ellis lake". The permit expressly provided "that fishermen who may engage in the seining of carp and other rough fish for sale, must first procure a commercial fishermen's license, and it is further provided *that a representative of the Fish and Game Commission must be present when seining operations are under way* and that the game fish which may be caught are to be taken care of, either by returning them to the water unharmed or by transplanting them *under the supervision of the representative of the Fish and Game Commission.* It is admitted by petitioner that although this permit was issued to the "City Manager of Marysville" Mabel Kayser was the real party in interest, and that the sole purpose of issuing the permit was to allow the Kaysers to engage in commercial fishing at Ellis Lake. Having secured this permit Kayser proceeded to Ellis Lake to commence seining operations. Joseph L. Means, applicant herein, appeared at the lake as the "representative of the Fish and Game Commission" referred to in the permit. It is the circumstances surrounding the employment of Means that present the first question to be determined in this proceeding, viz.: Was Means employed by the Kaysers, or was he an employee of the Fish and Game Commission? ▮ The Industrial Accident Commission first held that Means was an employee of the Kaysers, but on rehearing found that he was an employee of the Fish and Game Commission. It is the correctness of this last determination that is challenged in this proceeding.

L. W. Dinsdale, deputy fish and game warden of Marysville, testified that he received a telephone call from S. J. Carpenter, captain of the fish and game patrol in that area, informing him that the Kaysers had a permit to seine Ellis Lake, and that he, Dinsdale, should designate the representative of the Fish and Game Commission required by the permit. Carpenter went to the lake and examined the Kaysers' permit. He was then called out of town on urgent busi-

ness, and requested a volunteer warden, one Loehne, to select or designate the overseer. Loehne selected Means, and in accordance with instructions from Dinsdale, informed Means that his duty was to see that all game fish that were caught in the nets were removed from the nets before the rough fish were removed, and then either returned to the lake or transported to other streams or lakes as directed by the Fish and Game Commission. Dinsdale also testified that it was the custom that such overseer should be paid by the commercial fisherman whose activities he was supervising. In the present case, the evidence shows, Kayser agreed to pay Means six dollars per day, and in fact paid him that sum up until the time of the injury. Dinsdale also testified that the fishermen had no power to appoint or select such overseer, but that he had sole control over that; that he, through Loehne, gave Means instructions as to what he was to do; that Means' only duty was to see that no game fish were illegally removed; that he was under no duty to assist the fishermen in any other way. Means, as inspector or overseer, was supposed to be on the job whenever Kayser fished, and in this sense Kayser controlled the hours of employment of Means. On the other hand, Kayser could not fish unless and until Means was present. After supervising Kayser's activities at Ellis Lake for several days Means accompanied Kayser on an autotruck on a trip to a near-by lake for the purpose of transporting some of the game fish that had been caught to this other lake. On this trip Means received the injuries which gave rise to this proceeding. Dinsdale testified that it was part of the overseer's duties to take these trips to be sure that the game fish were in fact transported. Kayser testified that except for paying Means' wages, and designating the time for carrying on the fishing activities, he gave Means no orders; that Means got his orders from the warden or his deputy. Dinsdale testified that Means held his appointment as overseer at his, Dinsdale's, pleasure, and that if Means' work had not been satisfactory he, Dinsdale, would have removed him. The Fish and Game Commission contends that this evidence shows Means was the employee of the Kaysers. It is pointed out that the Kaysers paid Means his wages and controlled his hours of work. It is contended that Means was present for the benefit of the Kaysers; that Means was merely assisting the Kaysers to

perform their duties as required by the permit; that the Kaysers' permit was granted to them for their sole pecuniary gain; that the Fish and Game Commission in no way benefited by having Means present to supervise the Kaysers' fishing activities. We do not think that this interpretation of the evidence is correct. It is obvious that Means' presence was required by the Fish and Game Commission to assist it in performing its duties in reference to the protection of game fish. At the very time he was injured Means was supervising the transportation of game fish from one lake to another as directed by the commission. The purpose, nature and object of Means' appointment is repugnant to the contention that Means was employed by the Kaysers, the persons whose activities it was his duty to watch to see that game fish were not illegally removed. The mere fact that the Kaysers paid Means his wages is not determinative of the question as to who was his employer. In *County of Los Angeles* v. *Industrial Acc. Com.*, 123 Cal. App. 12 [11 Pac. (2d) 434]; one Calderwood was employed as a deputy marshal of the municipal court of Los Angeles. As such deputy his salary was paid by the county of Los Angeles. In spite of this fact it was held that he was an employee of the city of Los Angeles, and that the city and not the county was liable for compensation. At page 18 it is stated: "The contention of the city that, from the fact that the legislature has placed upon the county the burden of the payments of the salaries of the attaches of the municipal court, the county must be deemed the employer of the deceased is without justification. Although in most cases where the contract of employment exists between individuals, the source of payment as a rule is one of the *indicia* of the existence of the relationship, in cases involving governmental functions, this does not always seem to be true." Likewise, in *Claremont Country Club* v. *Industrial Acc. Com.* 174 Cal. 395 [L. R. A. 1918F, 177, 163 Pac. 209], this court held that a caddy was an employee of the country club although his wage was paid by the person using him.

The determinative feature in ascertaining whether the employer-employee relationship exists in any given case is the degree of control exercised by the alleged employer over the alleged employee. As was said in *Western Metal Supply Co.* v. *Pillsbury,* 172 Cal., at page 417

[Ann. Cas. 1917E, 390, 156 Pac. 491, 495]: "The real test by which to determine whether a person is acting as the servant of another is to ascertain whether, at the time when the injury was inflicted, he was subject to such person's orders and control and was liable to be discharged by him for disobedience of orders or misconduct." In weighing the control exercised it is the right of authoritative control that is important and mere suggestion as to detail. (*Stacey Bros. Gas Const. Co.* v. *Industrial Acc. Com.*, 197 Cal. 164 [239 Pac. 1072].)

Tested by the rules set forth in these cases it seems clear to us that the Industrial Accident Commission correctly held that Means was employed by the Fish and Game Commission. There can be no doubt that the right of authoritative control rested solely and exclusively with the Fish and Game Commission. It was to assist that commission in protecting game fish that Means was employed—not to assist the Kaysers in removing "rough" fish from Ellis Lake. While Means was performing his duties in seeing that game fish were not illegally removed the Kaysers had no control over him whatsoever. No service of any kind was being rendered for the Kaysers—the services were rendered for the benefit of the Fish and Game Commission. In addition to these facts, the evidence shows that the right to discharge Means ultimately and necessarily rested in the commission.

Petitioner also contends that admitting Means was an employee of the commission, the officers of that commission had no authority to employ him. It will be remembered that Means was employed as a result of an order given to Dinsdale by S. J. Carpenter, captain of the fish and game patrol in the Sacramento Valley, to appoint someone as the representative of the commission. Section 646 of the Political Code provides in part:

"It is the duty of the fish and game commissioners: To see that the laws for the protection and preservation of wild animals, wild birds, fishes, mollusks, crustacea and all other forms of aquatic animals and plants are strictly enforced, and for that purpose from time to time employ such deputies, with or without pay, clerks, assistants and other employees as they may need to discharge in proper manner the duties imposed upon them by law. . . . To employ

persons skilled in fish and game breeding to assist them in their duties.''

Under this section we think that the Fish and Game Commission has authority to appoint employees to aid it in the performance of its duties in the protection and preservation of fish, and that Means was such an employee.

Petitioner also contends that since the Fish and Game Commission paid Means no salary the case comes within the rule enunciated by this court in *Department of Natural Resources* v. *Industrial Acc. Com.*, 208 Cal. 14 [279 Pac. 987]. In that case Frank Machado was drowned while acting in the capacity of a volunteer deputy of the Fish and Game Commission, serving without pay. It was held that although Machado was an employee of the commission, his dependents were not entitled to compensation for the reason that he was not such an employee as came within the provisions of the Compensation Act. It was held that the Compensation Act excluded from its operation public officials serving without pay. That case can have no application here. In the instant case Means was not serving without pay, but was receiving six dollars per day. As we have already pointed out, it is immaterial who paid his wages, the important fact is that he was paid wages. For that reason the Machado case, *supra*, is not in point here.

For the foregoing reasons the award of the Industrial Accident Commission is affirmed.