[Civ. No. 19994. Third Dist. July 29, 1982.]

COUNTY OF SACRAMENTO, Plaintiff and Appellant, v.
THE STATE OF CALIFORNIA et al., Defendants and Appellants;
COUNTY OF LOS ANGELES, Intervener and Respondent.

**COUNSEL**

Lee B. Elam, County Counsel, Duane C. Miller and Miller & Rolfe for Plaintiff and Appellant.

George Deukmejian, Attorney General, Thomas E. Warriner, Assistant Attorney General, Floyd D. Shimomura and William F. Soo Hoo, Deputy Attorneys General, for Defendants and Appellants.

John H. Larson, County Counsel, and Daniel D. Mikesell, Jr., Deputy County Counsel, for Intervener and Respondent.

**OPINION**

**BLEASE, J.**—In this appeal from a judgment holding the state and various state officials (state) liable to the County of Sacramento (county) for the county's unreimbursed expenditures in administering a state-mandated program of "in-home supportive services" for aged, blind and disabled persons, we are called upon to decide the state's responsibility for funding the program. We hold that the state met its total funding obligation by exceeding the "matching" contribution required to secure federal dollars and that it was not further obligated to reimburse the county for administrative expenses.

FACTS

On January 1, 1974, the federal government consolidated its adult income maintenance programs for aged, blind and disabled persons and

reorganized their funding. (Pub.L. No. 92-603.) To qualify for federal funds, California enacted legislation for supplemental payments and services for aged, blind and disabled Californians. (Welf. & Inst. Code, § 12000 et seq., added by Stats. 1973, ch. 1216, § 37, p. 2904.) A program was created providing for in-home "supportive services," which include "domestic services, heavy cleaning, nonmedical personal services, accompaniment . . . during necessary travel[,] . . . other necessary transportation[,] . . . yard hazard abatement, protective supervision, . . . paramedical services, and other services . . . which make it possible for the recipient to live in comfort and safety under an independent living arrangement." (Welf. & Inst. Code, §§ 12300-12308.) It is one of ten social services programs mandated in every county by California's "Statewide Social Services Plan," which was adopted to conform with federal law. (See Welf. & Inst. Code, §§ 12250-12252.)

Seventy-five percent of the funding of the program is provided by the federal government *up to* the amount federally appropriated and allocated to the state.[1] The amount of federal dollars appropriated and allocated to California must be matched by $1 of state money for each $3 of federal money. (42 U.S.C. § 1397a(a)(1).)[2] The state may provide supplemental funds for program costs which exceed these amounts. Federal law does not prohibit a state from requiring *counties* to pay for a part or all of the state's matching or supplemental share of program costs.

The State Department of Social Services has developed a system for sharing these costs by the counties. The state pays for the "direct costs" of the in-home services program (such as cash payments to recipients), as well as employee time rendering homemaking and similar services or supervising such services, but denies reimbursement for "assessment time" (time spent by a social worker assessing a potential recipient's needs) and other costs of administration, for which *county* funds must be used to match and supplement federal contributions. This division of "direct" and "administrative" costs was carried over from a predecessor "attendant-care" program, which involved cash grants for in-home services.

---

[1]The federal government includes administrative expenditures among program costs. (42 U.S.C. § 1397a(a)(1).)

[2]The federal funding formula provides for funding of "75 percent of the total expenditures" of the in-home supportive services program (42 U.S.C. § 1397a(a)(1)), but since federal funds are limited by budget restrictions, the formula is read as requiring $1 of state funds for each $3 of federal funds *appropriated and allocated* to the state.

On March 23, 1977, the county filed a claim with the State Board of Control asserting a right to reimbursement of all of its expenditures, including administrative expenditures. On May 11, 1977, it filed a complaint in Sacramento Superior Court alleging that the state had not met its funding obligations and seeking relief. Within a short time two more counties filed suit and these cases were consolidated with Sacramento County's. Twenty-three other counties intervened. After a trial limited to the issue of liability and an "Interlocutory Judgment" finding the state liable, the county's action was severed from the others and a trial was had on the issue of damages. Judgment was subsequently rendered for the county, declaring the state liable for all costs of providing in-home supportive services, including assessment and administrative costs, ordering the state to revise its reimbursement scheme, and awarding Sacramento County $1,367,899 plus interest. The state appeals and the county cross-appeals on the issue of the amount of interest to which it claims it is entitled.

## DISCUSSION

At issue is whether California counties must pay for the administrative expenses of the in-home services program which are in excess of the amounts necessary to match the federal dollars appropriated and allocated to California by the federal government. We hold that, under the law applicable to the case,[3] they do except for "severely impaired persons."

Welfare and Institutions Code section 10800[4] imposes upon counties the basic "responsibility" for the "administration of public social ser-

---

[3]Commencing July 1, 1981, a new formula for the state-county share of costs of services became operative. (Stats. 1981, ch. 69, § 21.)

[4]Welfare and Institutions Code section 10800 provides: "Subject to the provisions of Section 11050 and Chapter 3 (commencing with Section 12000) of Part 3, the administration of public social services in each of the several counties of the state is hereby declared to be a county function and responsibility and therefore rests upon the boards of supervisors in the respective counties pursuant to the applicable laws, and in the case of public social services for which federal or state funds are provided, subject to the regulations of the department and the State Department of Health Services. [¶] For the purpose of providing for and carrying out this function and responsibility, the board of supervisors of each county, or other agency as may be otherwise provided by county charter, shall establish a county department, unless otherwise provided by the county charter. Except as provided herein, the county department shall be the county agency for the administration of public social services and for the promotion of public understanding of the public social services provided under this code and the problems with which they deal."

vices," "[s]ubject to the provisions of Section 11050 and Chapter 3 . . . of Part 3" of the Welfare and Institutions Code. That "responsibility" includes funding responsibility for the administrative costs of public social services, except as provided by the enumerated provisions.

The county claims that former Welfare and Institutions Code section 12306 (added by Stats. 1973, ch. 1216, § 37, p. 2912, eff. Dec. 5, 1973; amended by Stats. 1981, ch. 69, § 21 [see *ante*, fn. 3]), as applicable here, to which section 4800 is made "subject," placed a supervening responsibility upon the state for *all* costs of the in-home supportive services program. We disagree.

Section 12306 provided: "As regards in-home supportive services, the state shall pay the matching funds *required* for federal social services funds from the state's General Fund," including administrative costs. (Italics added.) (See *ante*, fn. 1.) The state is therefore directed to provide the funds necessary to match federal funding of the costs of administering social services. The matching requirement is $1 for each $3 of federal money actually appropriated and allocated to California for the in-home supportive services program. (See *ante*, fn. 2.) Section 12306 would have worked a complete state assumption of the nonfederal share of program expenditures *if* federal funds had met 75 percent of the actual program costs. They did not due to federal budget strictures. Section 12306 does not "require" state assumption of the federally unfunded portion of actual costs. ██ Accordingly, the county must look elsewhere for financial surcease or is thrust back upon its basic and residual responsibility under section 4800.[5]

---

[5]On June 17, 1981, long after the trial of this action, the Governor signed legislation amending Welfare and Institutions Code section 12306 and adding a new section 12306.1: "The amendment of Section 12306 made by this act does not mandate a new program or a higher level of service on any level of local government. The sole financial obligation of the state under this article before the effective date of this section was to match available federal social service funds allocated by the department, except as provided by Section 12302.2 and by subdivision (g) of Section 12304, which subdivision is repealed by the same act adding this section to the code. Additional funding which was previously made available from time to time in the annual Budget Act was not intended by the Legislature to be a permanent assumption of the county obligation to fund other program costs." (Added by Stats. 1981, ch. 69, § 22.) The Legislature, if constitutionally permitted to do so, may by appropriate legislation retroactively amend a statute. The Legislature has here attempted to retroactively, and only retroactively (since it is repealing the statute it interprets), declare what an earlier legislature meant. But it may not do so in the guise of a declaration about the meaning of a prior enactment. "'The ultimate interpretation of a statute is an exercise of the judicial power.' [Citations.] And our Supreme Court has succinctly stated the part which it, as the highest court of the state, must play in this process: '[I]t is the duty of this court, when

■ Two other statutes confirm this interpretation of section 12306. Section 12304, as applicable here (Stats. 1973, ch. 1216, § 37, p. 2911), made special provision for "severely impaired persons," a subclass of those eligible for in-home supportive services. It provided, in subdivision (g): "Funding for the in-home supportive services under this section shall qualify, where possible, for the maximum federal reimbursement. *In the event ... that federal funds prove inadequate, the state shall provide funding for services under this section.*" (Italics added.) Such funding is inclusive of administrative costs. These provisions are superfluous given the county's interpretation of section 12306. Plainly, it would not be necessary to specify state assumption of the federally unfunded costs of part of the program if section 12306 provided for state reimbursement for all costs.

More illuminating is section 12302.2 (added by Stats. 1978, ch. 463, § 4, eff. July 18, 1978), which funds for unemployment benefits for providers of in-home services: "(b) Funding for the costs of *administering this section* and for contributions, premiums, and taxes paid or transmitted on the recipient's behalf as an employer pursuant to this section shall qualify, where possible, for the maximum federal reimbursement. To the extent that federal funds are inadequate, *notwithstanding Section 12306*, the state shall provide funding for the purposes of this section." (Italics added.) The inference is inescapable that section 12306 does not provide for state assumption of all administrative costs of in-home services.[6]

such a question of law is properly presented, to state the true meaning of the statute *finally and conclusively....*' (*Bodinson Mfg. Co.* v. *California E. Com.* [1941] 17 Cal.2d 321, 326 [109 P.2d 935]; italics added.) [¶] In line with the well-established rule that statutory interpretation is a judicial function, the courts have consistently held that 'declaratory or defining statutes are to be upheld ... as an exercise of the legislative power to enact *a law for the future.*' [Citations.] Thus, the Legislature 'may not revise the operation of an existing law in the form of an amendatory statute to affect past transactions.' ... Further, our courts have concluded that subsequent legislation passed to clarify a statute 'merely supplies an indication of legislative purpose which may be considered together with other factors in arriving at the true intent existing at the time the statute was enacted.' (*In re Marriage of Paddock* (1971) 18 Cal.App.3d 355, 360 [95 Cal.Rptr. 652]; *Stockton Sav. & Loan Bank* v. *Massanet* [1941] 18 Cal.2d 200, 204 [114 P.2d 592]; *Flewelling* v. *Board of Trustees* (1960) 178 Cal.App. 2d 168, 172 [2 Cal.Rptr. 891].)" (Italics added.) (*People* v. *Cuevas* (1980) 111 Cal. App.3d 189, 199-200 [168 Cal.Rptr. 519]; and see 1A Sutherland, Statutory Construction (4th ed. 1972) § 27.04, pp. 313-314.)

[6]The county also says that former Welfare and Institutions Code section 12400 is inconsistent with our reading of section 12306. That statute, until it was repealed in 1979 (Stats. 1979, ch. 282, § 73, eff. July 24, 1979), appropriated to each county a specified amount of its "share toward the cost of state supplementary *aid* provided under this chapter." (Italics added.) The county reads "aid" as encompassing administrative costs. We disagree. Welfare and Institutions Code section 10052 defines "'[a]id'" as *"finan-*

Given our reading of section 12304, the county claims that it was not paid for all of its costs of administration of the "severely impaired persons" program as required thereby. We agree that the state must assume all costs of "services" for such period, including administrative costs. However, on the record before us, any unreimbursed administrative costs were offset by the payment to the county of funds in excess of the state's responsibility for other program costs, for which the county bears the residual responsibility. The state substantially exceeded its *total* funding obligations in every year after fiscal 1973-1974.[7]

The judgment is reversed.[8]

Puglia, P. J., and Regan, J., concurred.

The petition of appellant County of Sacramento for a hearing by the Supreme Court was denied November 10, 1982. Newman, J., did not participate therein.

---

*cial assistance* provided to or in behalf of needy persons ... including direct money payments and vendor payments." (Italics added.) We read the provision as referring to the supplemental *payment* component of the statutory scheme, not supplemental *services* programs. The county makes much of the language at the end of the statute referring to "[t]he counties' share toward the cost of care and administration," but this comports with the definition of "aid" as including "payments," which must be processed, and "medical care."

[7]The record shows that *on a statewide basis* the state paid in excess of its federally mandated share of administrative costs. The county made no showing that it was treated any differently than the statewide figures imply. Since the county received more than the amount to which it was entitled, we need not reach the issues whether the cost allocation system may have been inequitable and inconsistent, as the trial court found, or even invalid because not properly promulgated in the form of regulations, as the county suggests (and as the trial court specifically declined to so conclude).

[8]In view of our holding, we have no occasion to consider the county's appeal which was solely concerned with the proper amount of interest to be awarded.