[Civ. No. 22599. Third Dist. Mar. 1, 1984.]

IN-HOME SUPPORTIVE SERVICES et al., Petitioners, v.
WORKERS' COMPENSATION APPEALS BOARD
and MARJORIE BOUVIA, Respondents.

## Counsel

John K. Van de Kamp, Attorney General, Nelson Kempsky, Chief Deputy Attorney General, Richard D. Martland, Chief Assistant Attorney General, Marvin Goldsmith, Assistant Attorney General, Bruce J. Braverman and Seward L. Andrews, Deputy Attorneys General, William Kaplan and Stephen L. Katz for Petitioners.

Panattoni, Westley, Farrell & Fraulob and Leonard C. Panattoni for Respondents.

## Opinion

**BLEASE, Acting P. J.**—The In-Home Supportive Services Program (IHSS) (Welf. & Inst. Code, § 12300 et seq.) pays for domestic services to enable aged, blind and disabled persons to remain in their own homes. Marjorie Bouvia, at work as an IHSS attendant, injured her back helping an IHSS recipient out of a car and was awarded workers' compensation benefits for the injury. In this consolidated writ of review proceeding, the State Department of Social Services (hereafter the state), the state agency which is the administrator of the In-Home Supportive Services Program (IHSS) (see Welf. & Inst. Code, §§ 10110, 12300 et seq.),[1] and Argonaut Insurance Company seek annulment of an order of respondent Workers' Compensation Appeals Board denying reconsideration of the award. We will affirm the award.

---

[1] We identify the department as the party litigant based upon these statutes, despite the consistent usage of IHSS as a nom de guerre. The agreed statement of facts identifies "In-Home Support Services [as] a social service program funded by the State of California which provides at-home care and assistance for elderly and disabled persons." The Attorney General appeared before the Workers' Compensation Appeals Board as counsel for In-Home Supportive Services, but IHSS is a program, not a state agency. (See Lab. Code, § 3300, subd. (a), fn. 4, *post.*)

This case concerns the workers' compensation coverage of domestic employees of IHSS recipients. Workers' compensation coverage is a function of defined employment relationships. The state argues that coverage for IHSS workers is based upon the employment relationship with the IHSS recipient. (See Lab. Code, § 3351.5, subd. (b).) Bouvia must be excluded from coverage because she did not exceed the minimum wages and hours of work required for coverage by virtue of that employment. (See § 3352, subd. (h).) This argument assumes the employment relationship with the *recipient* is the exclusive ground of coverage. As we shall show, that is not the case. The workers' compensation law provides for coverage based upon dual employment relationships.

We hold the state is also the employer of an IHSS worker and Bouvia is entitled thereby to workers' compensation coverage for her injury.

FACTS

The matter was submitted on an agreed statement of facts.[2]

IHSS is a social service program funded by federal grant-in-aid moneys and funds of the state and county governments. (See Welf. & Inst. Code, § 10100 et seq.; § 12306; *County of Sacramento* v. *State of California* (1982) 134 Cal.App.3d 428 [184 Cal.Rptr. 648].) IHSS covers the gamut of tasks essential to safe and healthful household operations, from cleaning and cooking to transportation and assistance with ambulation. (See Welf. & Inst. Code, §§ 12300, 12304.)

The state supervises the county welfare departments (counties) which administer the program on the local level. (Welf. & Inst. Code, § 10600 et seq.; § 12302; see generally *City and County of San Francisco* v. *State of California* (1978) 87 Cal.App.3d 959 [151 Cal.Rptr. 469].) The counties are permitted three options to comply with the duty to provide IHSS services. "In order to implement such a plan, an individual county may hire homemakers and other in-home supportive personnel in accordance with established county civil service requirements or merit system requirements for those counties not having civil service, or may contract with a city, county, or city and county agency, a local health district, a voluntary non-

---

[2]We also take notice of the state's regulations governing IHSS. (See Evid. Code, §§ 451, 459.) These regulations are not published in the California Administrative Code. (See Welf. & Inst. Code, § 10554.) Additionally, we take judicial notice of documents offered by the state as extrinsic aids to the determination of the legislative intent in enacting Labor Code section 3351.5, subdivision (b), discussed herein. However, for reasons which appear, we do not credit their contents as persuasive evidence of the meaning of the statutes.

profit agency, a proprietary agency, or an individual or make direct payment to a recipient for the purchase of services." (Welf. & Inst. Code, § 12302.)

Bouvia's work as an individual provider of IHSS domestic services commenced after she sought work at the Department of Social Welfare of the County of Sacramento. The county sent her to an IHSS recipient, Mr. L., for whom she worked at the rate of $3.35 per hour, for 87 hours per month. In February of 1981 she commenced working for an additional recipient, Mrs. H., at the same pay rate, for 63 hours per month.

Mrs. H. was hospitalized in the first week of September of 1981 and Bouvia's services were no longer needed. She returned to the county, which sent her to interview Ms. M., another IHSS recipient. On September 16, 1981, she began working at Ms. M.'s home with an expectation of working 65 hours per month. She continued to work part of the day at Mr. L.'s home to which was added part-day work in Ms. M.'s home.

On September 21, 1981, Bouvia injured her back assisting Ms. M. out of a car. She continued to work both jobs but her condition worsened. She ceased work on October 6, 1981, as a result of her injury. During the 90-day period preceding the injury Bouvia worked at the homes of Mr. L., Mrs. H., and Ms. M. for a combined total of more than 52 hours and combined earnings of more than $100, the minimum requirements of section 3352. However, during this period, she had not been employed as *Ms. M.*'s IHSS provider for more than 52 hours nor did she earn in that employment more than $100. It is the failure of Bouvia to meet the minimum wage and hour requirement in the *sole* employ of Ms. M. which the state argues disqualifies her.

Bouvia applied for workers' compensation benefits for her injury. Her application lists "In-Home Supportive Services c/o County Welfare Department" as her employer, and Argonaut Insurance Company as the employer's insurance carrier. Argonaut answered the petition claiming that Bouvia is excluded from coverage by Labor Code section 3352, subdivision (h). Thereafter, the Attorney General appeared in the case on behalf of In-Home Supportive Services. The workers' compensation judge ruled against the state and Argonaut and they unsuccessfully petitioned the Workers' Compensation Appeals Board for reconsideration. This writ of review followed.

## Discussion

### I

This case requires us to construe provisions of the Labor Code[3] (principally §§ 3351, 3351.5, and 3352) which govern workers' compensation coverage of domestic employments.

The workers' compensation law predicates coverage for work injuries upon defined employment relationships. They are generally to be found, not in the definition of employer,[4] but in the definitions of "employee." That is, an "employee," as defined by specified employment relationships, is one who is entitled to workers' compensation coverage for an injury occurring in the course of the specified employment.

The definitions of "employee" are hierarchically organized, first, to *include* as "employees" a broad class of employment relationships (§ 3351), and, second, to *exclude* from this class limited types of employment relationships (§ 3352). An employer which hires an "employee," i.e., which enters into a covered employment relationship, is obligated to provide workers' compensation coverage for the employee.

This hierarchial organization reflects the priority given coverage by the workers' compensation law. (See § 3202.) We follow this order of priority in first determining the issue of inclusion and then the issue of exclusion.

### II

### A.

■ The first issue is whether the IHSS worker is a covered "employee" of the state by virtue of an employment relationship established by the state's control of IHSS work.

---

[3]All references are to the Labor Code unless otherwise specified.

[4]Employers are generally defined as the persons or entities, including the state and counties, which are subject to workers' compensation obligations in *otherwise* defined employment relationships. (§ 3300.) Thus, section 3300 provides: "As used in this division, 'employer' means: [¶] (a) The State and every State agency. [¶] (b) Each county, city, district, and all public and quasi public corporations and public agencies therein. [¶] (c) Every person including any public service corporation, which has any natural person in service. [¶] (d) The legal representative of any deceased employer."

Labor Code section 3351[5] sets forth the inclusive rules of coverage. It defines a covered "employee" as "every person in the service of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written, whether lawfully or unlawfully employed . . . ." Section 3357 augments this definition in stating that: "[a]ny person rendering service for another, other than as an independent contractor, or unless expressly excluded herein, is presumed to be an employee."

▆▆ The definitional reach of these covered employment relationships is very broad. ▆▆ ▆▆▆ ▆▆ ▆▆ Although the employment relation in workers' compensation law is an outgrowth of the common law relationship of master and servant (See *Flickenger* v. *Industrial Acc. Com.* (1919) 181 Cal. 425, 429 [184 P. 851, 19 A.L.R. 1150]; compare *Oxford* v. *Signal Oil & Gas Co.* (1970) 12 Cal.App.3d 403, 408 [90 Cal.Rptr. 700], with Rest.2d Agency (1958) § 220; also see 2 Hanna, Cal. Law of Employee Injuries & Workmen's Compensation (2d ed. 1970) § 3.01),[6] the scope of included employment relationships is not limited to genotypes of this parentage. "[A]n 'employment' relationship sufficient to bring the act into play cannot be determined simply from technical contractual or common law conceptions of employment but must instead be resolved by reference to the history and fundamental purposes underlying the [Worker's] Compensation Act . . . ." (*Laeng* v. *Workmen's Comp. Appeals Bd.* (1972) 6 Cal.3d 771, 777 [100 Cal.Rptr. 377, 494 P.2d 1].)

In *Laeng,* the Supreme Court held a city liable as employer of a job applicant who was injured in a physical agility test conducted by the city as part of a "tryout" for a city job. While not wholly discarding common law principles, *Laeng* reads sections 3351 and 3357 broadly in light of the beneficent purpose of the workers' compensation law. (*Laeng, supra,* 6 Cal.3d at pp. 777-778, fn. 7; also see Comment, *Labor Law: Scope of the Term*

---

[5]Domestic services are defined in Labor Code section 3351, . . . which provides in pertinent part: [¶] "'Employee' means every person in the service of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written, whether lawfully or unlawfully employed, and includes: [¶] (d).Except as provided in subdivision (h) of Section 3352, any person employed by the owner or occupant of a residential dwelling whose duties are incidental to the ownership, maintenance, or use of the dwelling, including the care and supervision of children, or whose duties are personal and not in the course of the trade, business, profession, or occupation of such owner or occupant."

[6]A servant is one "who performs continuous service for another and who, as to his physical movements, is subject to the control or to the right to control of the other as to the manner of performing the service." (Rest.2d Agency § 220, com. on subd. (1)(a), p. 486.) A contract of hire is a contract exchanging the promise of such service for the promise of payment. Labor Code section 2750 provides: "The contract of employment is a contract by which one, who is called the employer, engages another, who is called the employee, to do something for the benefit of the employer *or* a third person." (Italics added.)

*"Employee"* (1944) 32 Cal.L.Rev. 289, 299.) ■ That purpose is the social and economic objective "to distribute the risk of service-connected injuries . . . by charging all enterprises with [the] costs. . . ." (*Laeng, supra,* 6 Cal.3d at p. 782, quoting with approval from *Van Horn* v. *Industrial Acc. Com.* (1963) 219 Cal.App.2d 457, 467 [33 Cal.Rptr. 169]) and thereby to ameliorate the economic burden on the employee of work-connected injury. This principle has been applied frequently in defining a covered employment relationship.[7]

## B.

We apply these principles here. The facts of Bouvia's employment are not disputed. Accordingly, whether she is within a covered employment relationship is a question of law. (See *Laeng* v. *Workmen's Comp. Appeals Bd., supra,* 6 Cal.3d at p. 783; *Baugh* v. *Rogers* (1944) 24 Cal.2d 200, 205-207 [148 P.2d 633, 152 A.L.R. 1043].) ■ Is the state, by virtue of its actions and the actions of its agent, the county, an employer of an IHSS worker within the inclusive rule of coverage of section 3351? For reasons which follow, we conclude the answer is yes. The "substance and essence of the relationship" (see *Pruitt* v. *Workmen's Comp. App. Bd.* (1968) 261 Cal.App.2d 546, 552 [68 Cal.Rptr. 12]) is that of employer and employee.

At the outset we note the role of the state in this action. The state appears as the IHSS division of the State Department of Social Services. (Welf. & Inst. Code, §§ 10110, 12300 et seq., see fn. 1, *ante.*) That fact reflects the role of the state as the principal having ultimate direction and control of the IHSS program by virtue of its authority to supervise the program and through the supervision and control of the counties acting as its agent.

■ When the state delegates the duty to provide IHSS services, as here, to the county, the relation between them is one of principal and agent. (cf. *Ross* v. *Superior Court* (1977) 19 Cal.3d 899, 907-909 [141 Cal.Rptr. 133,

---

[7]A golf course is an employer of caddys paid and directed by its individual members. (*Claremont C. Club* v. *Industrial Acc. Com.* (1917) 174 Cal. 395 [163 P. 209].) The state Department of Natural Resources is the employer of a person who was paid by fishermen to insure they were not taking game fish under a netting permit to take rough fish and carp. (*Dept. of Nat. Resources* v. *Indus. Acc. Com.* (1932) 216 Cal. 434 [14 P.2d 746].) A hospital is the employer of a student nurse who exchanges unpaid service in the facility, as part of her course of study, for clinical experience needed to obtain a license. (*Anaheim General Hospital* v. *Workmen's Comp. App. Bd.* (1970) 3 Cal.App.3d 468 [83 Cal.Rptr. 495].) A county is the employer of a general assistance recipient who exchanges work as a watchman for a school district for the right to receive general assistance benefits. (*County of Los Angeles* v. *Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 391 [179 Cal.Rptr. 214, 637 P.2d 681].)

569 P.2d 727].) The county's exercise of its supervisory and other powers over the IHSS program is imputed to the state. (See, e.g., *Cowell* v. *Industrial Acc. Com.* (1938) 11 Cal.2d 172, 176 [78 P.2d 1016]; 2 Hanna, *op. cit. supra,* § 3.02 [2] [b].)[8] With this in mind, we examine the IHSS attendant program.

State regulations provide three means for the delivery of IHSS services: through county employees, in accord with established civil service or merit system requirements; through purchase of service from an agency, or; through purchase of service from an individual. (State Department of Social Services, Manual of Policies & Procedures, Division 30, (hereinafter regs.) § 30-467; currently regs. § 30-767, eff. Sept. 7, 1983.[9]) If a county elects purchase of service from an individual, the county must make payment through a state payrolling system, also prescribed by regulation. (Regs. § 30-467.132; current § 30-767.131.)

Using this latter method, as applicable at the time of Bouvia's injury, the individual provider and the IHSS recipient must sign and date a prescribed timesheet verifying the rendering of authorized services to the recipient. (Regs. § 30-469.82;[10] § 30-469.723; current § 30-769.723.) The county welfare department must submit appropriate data on those services to the state. (Regs. § 30-469.2; currently § 30-769.2.) Payments for authorized services are normally sent directly to the individual provider of services. (Regs. § 30-469.73; current § 30-769.73.)

There is an exception to direct provider payment in the case of a severely impaired recipient; one who requires more than 20 hours a week of intimate personal IHSS services and elects to select, hire, and pay his or her own provider. (Welf. & Inst. Code, § 12304; regs. § 30-469.73; current regs. § 30-769.73.) If this election is made: "the provider shall be hired, supervised, and paid by [the recipient]." (Regs. § 30-469.735; current § 30-769.736.) Payments for services are then made directly to the recipients. (Regs. § 30-469.731; current § 30-769.731.) Recipients who do not qualify for or exercise this option are only permitted a "preference" in the selection

---

[8]This conclusion is premised upon the *sui generis* relationship of the county and the state in the regulation and control of state-mandated welfare benefits and upon the fiscal realities of the IHSS program. With limited exceptions, after the 1981-1982 fiscal year the state must bear all costs of IHSS services. (§ 12306; Stats. 1981, ch. 102, urgency, eff. June 17, 1981.) Such "services" include the "direct costs" of the in-home services program (*County of Sacramento* v. *State of California, supra,* 134 Cal.App.3d at p. 431), including, necessarily, the costs of workers' compensation coverage not specifically provided for under section 12302.2. Accordingly, the IHSS funding requirements correspond with the obligation of the state as *an* employer.

[9]Current regulations title the last delivery option, "Purchase of Service By a Recipient."

[10]Current regulations do not require provider signature.

of their provider. (Welf. & Inst. Code, § 12304.1.) Bouvia's service for Ms. M., for less than 20 hours per week, was of this variety.

In either event, the amount and nature of IHSS services required by the recipient is determined by the county welfare department. (See, e.g., Welf. & Inst. Code, § 12301.1.) County social services staff determine the types of services to be provided, the service delivery method, and the number of hours per service per week. (Regs. 30-461; current regs. 30-761.) These determinations are based on the recipient's physical and mental condition, living situation, and social situation. (*Ibid.*) Even if the payment for services is sent to the recipient, the county department retains the right to institute a different form of service delivery or provider payment, i.e. to divest the recipient of the right to hire and reduce it to a bare preference, if there is a substantial deviation from the county's assessment of need in use of the funds. (Regs. § 30-467.134; current § 30-767.133.)

■ This scheme of engagement of individuals by the state, through its agents, to perform IHSS services for recipients required by state regulations establishes an employment relationship. The individual must do the chores listed in the county assessment of need. Payment for these services is provided by the state.[11] The county, under the regulatory scheme, has the right to sufficient control over the IHSS provider to make the state chargeable, by virtue of the agency relationship with the state, as *an* employer. Even where provider payment is made via the recipient the county retains the right to change the payment made and thus exercise direct hiring and firing control when it discerns that the work the state is paying for is not being performed in accordance with the assessment of need.

■ An indicia of control is the right of the employer to terminate the relation without liability. (See *Hillen* v. *Industrial Acc. Com.* (1926) 199 Cal. 577, 582 [250 P. 570]; *Kowalski* v. *Shell Oil Co.* (1979) 23 Cal.3d 168, 177 [151 Cal.Rptr. 671, 588 P.2d 811].) ■ The fact that the county did not, on this record, choose to exercise this right, or to directly supervise Bouvia in the conduct of her tasks, is not a barrier to the conclusion the right of control is sufficient to establish an employment relationship. (Compare *County of Los Angeles* v. *Worker's Comp. Appeals Bd.* (1981) 30 Cal.3d 391, 406 [179 Cal.Rptr. 214, 637 P.2d 681].) ■ It is the right to control and not the exercise of that right which is the test. (See e.g.

[11]Moreover, delivery of the services in this manner substitutes for delivery of equivalent services by covered employees in institutions or by the employees of contractors in the home. We discern no reason or policy to expose workers who perform these services, as did Bouvia, to differential exposure to uninsured status because of the choice of means by which the work is organized.

*Johnson* v. *Workmen's Comp. Appeals Bd.* (1974) 41 Cal.App.3d 318 [115 Cal.Rptr. 871].)

■ These indicia of covered employments are made conclusive of that status by the policy consideration that failure to make the state an employer leaves IHSS workers without protection for significant periods of employment, by limiting the covered employment relationship to that with the IHSS recipient. This results in a failure of coverage unless the IHSS worker has, prior to the injury, exceeded the hours and wages thresholds of section 3352, subdivision (h), in the employ of a *single* recipient.

In view of *Laeng*'s injunction to read the statute to favor coverage, we cannot view this prospect of uninsured exposure with equanimity. (*Laeng, supra,* 6 Cal.3d at pp. 777-778.) An IHSS worker is archetypically within the remedial purposes of the workers' compensation law. "The Workmen's Compensation Law seems largely aimed at protecting the very class of people personified by [Bouvia]. She is a cleaning woman. That is her sole means of livelihood. She is most in need of the protection of the Workmen's Compensation Law." (*Johnson* v. *Workmen's Comp. Appeals Bd., supra,* 41 Cal.App.3d at p. 322.)

That an IHSS worker is an employee of the IHSS recipient is not a barrier to the conclusion the state is *also* the worker's employer. Simultaneous employment is not a novelty in the law of workers' compensation. Dual employment, with consequent dual workers' compensation liability, has long been recognized in cases in which the employers are joint, or general and special. (See Annot. (1924) 30 A.L.R. 1000; Annot. (1929) 58 A.L.R. 1467; Annot. (1944) 152 A.L.R. 816.) ■ Joint employment occurs when two or more persons engage the services of an employee in an enterprise in which the employee is subject to the control of both. (See 2 Hanna, op. cit. *supra,* § 305 [3].) ■ General and special employments occur when a general employer furnishes an employee to another person and during this engagement both employers have some right of control over the performance of the employee's services. (See, e.g., *County of Los Angeles* v. *Worker's Comp. Appeals Bd., supra,* 30 Cal.3d at pp. 405-406; see also §§ 2750, 3300, fn. 4, *ante.*)

■ The relationship here suffices to show a dual employment.[12] (See *State Compensation Insurance Fund* v. *Industrial Acc. Comm.* (1966) 31

---

[12]We emphasize this conclusion is grounded on the definition of employee for workers' compensation coverage and has no necessary application to dissimilar contexts, e.g. respondeat superior.

Cal.Comp.Cases 165, reaching the same conclusion concerning a predecessor to IHSS, part of the Old Age Security Law, Stats. 1965, ch. 1784, §§ 12000 et seq., esp. § 12152; compare *Bonnette* v. *California Health and Welfare Agency* (N.D.Cal. 1976) 414 F.Supp. 212, suggesting counties and state as well as IHSS recipients are joint employers of IHSS providers for purposes of the federal Fair Labor Standards Act.)

III

This brings us to the issue whether an IHSS worker is nonetheless excluded from coverage under section 3351 by virtue of a statutory exclusion.

In interpreting the workers' compensation statutes we do not start with whole cloth. We are directed by section 3202 to "liberally construe[]" the workers' compensation statutes "with the purpose of extending their benefits for the protection of persons injured in the course of their employment." This rule provides a means for resolution of ambiguities in the statutes which affect coverage. It cannot, of course, override a clear statutory expression of exclusion from coverage (see *Arp* v. *Workers' Comp. Appeals Bd.* (1977) 19 Cal.3d 395, 409 [138 Cal.Rptr. 293, 563 P.2d 849]; *Fuentes* v. *Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 1, 8 [128 Cal.Rptr. 673, 547 P.2d 449]; *Goldberg* v. *Pacific Emp. Ins. Co.* (1945) 70 Cal.App.2d 472, 476 [161 P.2d 272]; cf. *Colonial Ins. Co.* v. *Ind. Acc. Com.* (1945) 27 Cal.2d 437, 439-440 [164 P.2d 490]). But "in the solution of problems such as [affect coverage for domestic employments], our inquiry must be this: Is the employment *unmistakably excluded* by the terms of the act?" [italics in original] (*Lacoe* v. *Industrial Acc. Com.* (1930) 211 Cal. 82, 86 [293 P. 669].) We read this to mean that if there are two reasonable interpretations of an ambiguous statute, one providing for coverage and one not, we must decide for coverage.

No statute expressly says the IHSS worker's employment relationship with the state is excluded from coverage. The state's argument is not directly founded upon the exclusions of section 3352.[13] Nor does a statute

---

[13]Section 3352 provides in pertinent part: " 'Employee' excludes: (h) Any person defined in subdivision (d) of Section 3351 [see *ante*, fn. 5] who was employed by the employer to be held liable for less than 52 hours during the 90 calendar days immediately preceding the date of the injury for injuries as defined in Section 5411 or during the 90 calendar days immediately preceding the date of the last employment in an occupation exposing the employee to the hazards of such disease or injury for injuries as defined in Section 5412, or who earned less than one hundred dollars ($100) in wages from such employer during the 90 calendar days immediately preceding the date of the injury for injuries as defined in Section 5411 or during the 90 calendar days immediately preceding the date of the last employment in an occupation exposing the employee to the hazards of such disease or injury for injuries as defined in Section 5412."

say the IHSS worker's employment relationship with the IHSS recipient is the *only* one upon which coverage may be predicated. Rather, the state grounds its argument upon section 3351.5, subdivision (b), as added in 1978, which says an IHSS worker is "*an* employee of the recipient." (Stats. 1978, ch. 463, § 2, p. 1571, urgency, eff. July 18, 1978.)[14] The state implicitly argues that if an IHSS worker is "*an* employee of" the recipient he or she cannot also be an employee of the state. We are thus asked to draw a negative implication from this language, that the *in*clusion of one employment relationship requires the *ex*clusion of all others. For the following reasons we reject the inference.

A.

■■ ■■■ ■■ The search for statutory meaning must begin with the text.[15]

Because of the statutory rule of liberal construction, Bouvia will prevail if coverage as an employee of the state can be reconciled with the statutory text. Conversely, if the language can only be accounted for by accepting the inference it is meant to exclude alternate coverage of persons employed by IHSS recipients, the state will prevail. The state relies on an implied meaning. An "[i]mplied meaning . . . is [a] meaning that exists only by virtue of [a] specific context." (Dickerson, The Interpretation and Application of Statutes, *supra,* at pp. 40-41.) So we look to the context within which the disputed phrase occurs.

■■ As we have shown, section 3351.5 does not stand alone. Section 3351 is the primary measure of coverage for IHSS workers. Thus, for a negative implication to be drawn, the language of section 3351.5 ("an employee of the recipient") must bear the burden of nullifying the coverage provided by section 3351. Because of meanings derived from the history and structure of the workers' compensation statutes that cannot be done.

---

[14]The pertinent text of section 3351.5 is: "'Employee' includes: (b) Any person defined in subdivision (d) of Section 3351 who performs domestic service comprising in-home supportive services under Article 7 (commencing with Section 12300), Chapter 3, Part 3, Division 9 of the Welfare and Institutions Code. For purposes of Section 3352, such person shall be deemed an employee of the recipient of such services for workers' compensation purposes if the state or county makes or provides for direct payment to such person or to the recipient of in-home supportive services for the purchase of services, subject to the provisions of Section 12302.2 of the Welfare and Institutions Code."

[15]"For constitutional reasons, the ascertainment of legislative meaning necessarily focuses on the enacted statute and not on an unenacted expression of legislative will, however reliable. An unenacted utterance has force, if at all, only as part of the proper context of the statute." (Dickerson, The Interpretation and Application of Statutes (1975) p. 144; see also *Nunez* v. *Superior Court* (1983) 143 Cal.App.3d 476, 480 [191 Cal.Rptr. 893].)

In 1937, the present organization of included and excluded employment relations was adopted. (Stats. 1937, ch. 90, p. 267.) Section 3351 defines the included employment relationships; section 3352 defines the excluded employment relationships. The 1937 law expressly addressed the status of domestic service employment. Former subdivision (f) of section 3352 excluded, *without limitation,* "[a]ny person engaged in household domestic service." (Stats. 1937, ch. 90, § 3352 (b), p. 267.) This express exclusion was undoubtedly deemed necessary to preclude the *in*clusion of household domestic service employments by application of the general inclusion language of section 3351.

In 1939, section 3358.5 was added to the law to *in*clude, as a covered "employee," "[a]ny person engaged in household domestic service who is employed by one employer for over fifty-two hours per week . . . ." (Stats. 1939, ch. 1043, § 2, p. 2874.) In the same enactment, subdivision (g) of section 3352 was amended to except from its unlimited exclusion of domestic service employments the employment defined in 3358.5. (Stats. 1939, ch. 1043, § 1, p. 2874.) By this means, coverage was extended *only* to domestic service workers meeting the hours thresholds of section 3358.5.

In 1975 the Legislature repealed these provisions and added subdivision (d) to section 3351[16] to "include" as a covered "employee" any person employed by the owner of a private dwelling who performs household domestic services. At the same time subdivision (a) was added to section 3352 to exclude such an employment relationship from coverage if the owner is a parent, spouse, or child of the employee.

Of singular importance, these amendments repealed the provisions of the 1939 law (former § 3352, subd. (g)), excluding (with the noted exception) all domestic service workers as "employees," thereby making the coverage provisions of section 3351 applicable. The question then arises: what is the purpose of the specific inclusion of certain domestic employments if they are already covered within 3351's general provisions? The answer is twofold. First, it specifies the conditions upon which the obligation of the household employer to provide coverage is predicated. Second, if there is no other ground of coverage and the conditions are not met, i.e. if there is no additional covered relationship, there is no workers' compensation coverage.

---

[16]Subdivision (d) was added to section 3351 to include as a covered employee: "(d) Any person employed by the owner of a private dwelling whose duties are incidental to the ownership, maintenance, or use of the dwelling, including the performance of household domestic service. . . ." By the same enactment subdivision (a) was added to section 3352 to exclude from *this* definition, any person employed by his parent, spouse or child. (Stats. 1975, ch. 1263, §§ 4 and 5, eff. Jan. 1, 1977.)

Thus, the express *inclusion* of certain domestic employments in subdivision (d) does not single them out as the exclusive ground of coverage. Rather, it (together with § 3352) identifies the conditions required for coverage when it is predicated upon the employment relations defined by the subsection. Thus, if (say) a homeowner is to be held liable for coverage of a domestic employee he (or she) cannot be, by virtue of 3352, subdivision (a), the employee's parent, spouse, or child.

Shortly after the 1975 reform took effect, the Legislature enacted the current minimum wages and hours thresholds for specified domestic services employments by amendment of sections 3351 and 3352. (Stats. 1977, ch. 17, §§ 17-18, pp. 30-31.)[17] Subdivision (d) of section 3351 was amended to expand its domestic employment relationship to householders. The wages and hours requirements for coverage, here at issue, were added as subdivision (h) of section 3352. These provisions were embodied in an urgency measure with the legislative explanation that the insurance coverage contemplated by the 1975 reform had not been made readily available. (Stats. 1977, ch. 17, § 32, p. 39.) Implicit in this history is a legislative purpose to impress the workers' compensation obligation upon householder domestic employers only when the risk spreading mechanism of insurance is available.

We now come to the provisions upon which the state must base its inference of exclusion. Section 3351.5, subdivision (b) was grafted upon this statutory matrix in 1978. (Stats. 1978, ch. 463, § 2, p. 1571, urgency eff. July 18, 1978.) It was enacted as part of a complex statute whose stated purpose is to insulate economically disadvantaged IHSS recipients from the costs and burdens of employer status. The legislation recites: "Coverage of in-home supportive services for workers' compensation, unemployment and disability insurance has resulted in hardship to recipients of such services and confusion as to the status of recipients as employers." (*Id.*, § 6, p. 1573.) In this context it states the statutory purpose is: "to provide for the *welfare of recipients by* establishing a system of assurances and delegation of performance of employer's duties." (*Ibid.*; italics added.)[18]

---

[17]Subdivision (d) of section 3351 was amended to include as employees: "(d) Except as provided in subdivision (h) of Section 3352, any person employed by the owner or occupant of a residential dwelling whose duties are incidental to the ownership, maintenance, or use of the dwelling, including the care and supervision of children, or whose duties are personal and not in the course of the trade, business, profession, or occupation of such owner or occupant." Subdivision (h) was added to section 3352 to limit such relationships to "[a]ny person . . . who was employed by such employer for less than 52 hours [or earned less than $100] during the 90 calendar days immediately preceding the date of the injury . . . ."

[18]It should be noted this does *not* say there is a purpose to exclude any covered relationship with the state or counties.

In keeping with this purpose, section 3351.5, subdivision (b) was added to limit coverage for IHSS workers *if* based upon *employment by the recipient*. It contains two sentences. [1] An employee *"includes"*: "[a]ny person defined in subdivision (d) of Section 3351 who performs domestic service comprising in-home supportive services . . . . [2] For purposes of Section 3352, such person shall be deemed an employee of the recipient of such services for workers' compensation purposes if the state or county makes or provides for direct payment to such person or to the recipient of in-home supportive services for the purchase of services, subject to the provisions of Section 12302.2 of the Welfare and Institutions Code."[19]

The subsection speaks in the language of *in*clusion ("includes"). It functions, as does subdivision (d) of section 3351, discussed above, to specify the conditions of coverage when predicated upon the employment relationship *with the recipient*. In fact, such an employment relationship is but a subclass of that defined by subdivision (d) of section 3351 because it applies only to "a person *defined in subsection (d)*" who performs IHSS services.[20]

These provisions make clear that the limitations of section 3352 apply only when the IHSS employment with the recipient is within the householder relationship defined in 3351, subdivision (d). Therefore subdivision (b) of section 3351.5 (literally) does no more, and no less, than specify the con-

---

[19]Welfare and Institutions Code section 12302.2 provides, in relevant part: "(a) If the state or a county makes or provides for direct payment to a provider chosen by a recipient or to the recipient for the purchase of in-home supportive services, the department shall perform or assure the performance of all rights, duties and obligations of the recipient relating to such services as required for purposes of unemployment compensation, unemployment compensation disability benefits, workers' compensation, federal and state income tax, and federal old-age survivors and disability insurance benefits. Such rights, duties, and obligations include, but are not limited to, registration and obtaining employer account numbers, providing information, notices, and reports, making applications and returns, and withholding in trust from the payments made to or on behalf of a recipient amounts to be withheld from the wages of the provider by the recipient as an employer and transmitting such amounts along with amounts required for all contributions, premiums, and taxes payable by the recipient as the employer to the appropriate person or state or federal agency. The department may assure the performance of any or all such rights, duties, and obligations by contract with any person, or any public or private agency." Subdivision (b) provides that: "To the extent that federal funds are inadequate . . . the state shall provide funding for the purposes of this section." (See *County of Sacramento* v. *State of California, supra,* 134 Cal.App.3d 428.)

[20]The second sentence, upon which the state relies, says that "[f]or purposes of Section 3352 (which contains the wages and hours limitations at issue here), *"such person* shall be deemed *an* employee of the recipient . . . ." (italics added) [the limitations]. "[S]uch person" refers to persons defined in subdivision (d). Since section 3352 specifically addresses conditions for exclusion from coverage when predicated upon subdivision (d) of section 3351, and the 3351.5, subdivision (b) employment relationship is a subclass of the 3351, subdivision (d) class, the "for purposes of 3352" must mean for purposes of application of the limitations upon coverage contained in section 3352.

ditions to coverage that attach *if* coverage is predicated upon "an" employment relationship with the IHSS recipient.

### B.

The state has two further arguments in support of the inference of exclusion, both premised upon legislative history. The first relies upon the textual evolution of Assembly Bill No. 3028, 1977-1978 Regular Session, the vehicle by which section 3351.5, subdivision (b) was enacted. The state notes the second draft of the bill designated, with limited exceptions, the county welfare department as the employer of IHSS workers. (Assem. Amend. to Assem. Bill No. 3028 (1977-1978 Reg. Sess.) May 10, 1978, § 3.)[21] The state reasons that the removal of this provision, by subsequent amendment, together with the addition of subdivision (b) of 3351.5, (see Assem. Amend. to Assem. Bill No. 3028 (1977-1978 Reg. Sess.) June 8, 1978) must be read as implying a rejection of county and state employer liability.

Standing alone, the implication is one that might reasonably be drawn. It does not stand alone. The contextual history we have detailed compels the contrary inference. Moreover, there is no conclusive evidence the Legislature as a whole considered this amendment for the purpose assigned by the state. The statute tells us the Legislature is concerned with the welfare of the recipient, not the state. These reasons account for the language employed without giving rise to an inference that failure to go further manifests a policy choice to exclude coverage based upon employment with the state. If the Legislature had intended to retract existing coverage, plain language was available (as it was in 1937) to do so.[22]

---

[21]As introduced, Assembly Bill No. 3028 added section 3302 to define "employer" for purposes of coverage of IHSS attendants. The definition made the individual or entity with which the county contracted for IHSS services an employer. It also made the county the employer if it made direct payment for services to the recipient unless otherwise requested by the IHSS recipient. At the same time section 3351 was amended to include as an employee any person employed to perform in-home supportive services. Assembly Bill No. 3028 was amended in the Assembly on May 10, 1978, to redefine employer in section 3302 as the county or an entity with which the county contracts unless requested by the recipient. On June 8, in the Assembly, Assembly Bill No. 3028 was again amended to delete new section 3302, to delete the changes in 3351 and to add the provision at issue, subdivision (b) of 3351.5.

[22]Moreover, the Legislative Counsel's Digest, which accompanied the final version of the bill, did not alert anyone to the claim the object of the legislation was to exclude anyone previously covered. On the contrary, it emphasized that: "This bill would *include* within the coverage of the workers' compensation law specified persons who perform domestic service comprising in-home supportive service under county programs." (Italics added.) In this context, the digest said: "[f]or purposes of the workers' compensation law, the recipient of in-home supportive services would be regarded as the employer, if the state or county makes or provides direct payment to the recipient or to a provider chosen by the recipient." Finally, and most pertinently, the digest also stated that persons performing domestic services who did not exceed the thresholds of section 3352 were currently *excluded* from coverage of the workers' compensation law.

Lastly, the state offers extrinsic evidence of a legislative intent to exclude the state and county from liability. It includes various memoranda concerning Assembly Bill No. 3028, the vehicle for enactment of section 3351.5, subdivision (b).[23] In some other context these shards of meaning exhumed from the legislative process might provide evidence of the purpose for which the legislation was enacted. (See generally Comment, *The Use of Extrinsic Aids in Determining Legislative Intent in California: The Need For Standardized Criteria* (1981) 12 Pacific L.J. 189.)

■ The significance to be accorded extrinsic evidence of legislative intention (or purpose) depends upon its capacity to resolve ambiguities in statutory language, including the contextual ambiguities relating to implications of meaning. Despite the anthropomorphic overtones of the word "intention," the Legislature is not a person. What goes on in the minds of individual legislators when enacting a statute cannot fix its meaning.[24] Rather, the Legislature is a collective entity and its "intentions" are primarily known by its legislative acts. (See *ante,* fn. 15.) The statutes themselves embody the collective "intention" of the Legislature. "*[W]henever a law is adopted, all that is really agreed upon is the words.*" (Kohler, Judicial Interpretation of Enacted Law, in Science of Legal Method (1921) 187, 196; italics added.) ■ As was said long ago, and often repeated, " '[i]t is elementary that there can be no intent in a statute not expressed in its words; that the intention of the legislature must be determined from the language of the statute. . . .' (*Seaboard Acceptance Corp.* v. *Shay* (1931) 214 Cal. 361, 365 [. . .].)" (*In re Goddard* (1937) 24 Cal.App.2d 132, 139 [74 P.2d 818].) That is not to say that extrinsic evidence is never relevant to statutory meaning. ■ In cases of statutory ambiguity a variety of means may be employed by which to resolve the semantic problem. But it is only as evidence of corporate knowledge and purpose which bears upon specific language that an extrinsic aid is relevant to proof of corporate intention.[25]

---

[23]Most of the analyses of the bill are from the Governor's chaptered bill file, an *after-the-fact* source of dubious value. (See Dickerson, op. cit. *supra,* at pp. 144-145; see also fn. 25, *post.*) The analyses which are contemporaneous with Assembly Bill No. 3028 are briefly discussed.

[24]This would create not only intolerable problems of idiosyncratic meanings but run counter to the common understanding of language usage upon which the very capacity of language to communicate depends.

[25]The Legislature has recognized this principle in its interim studies: "the material [to be used to evidence intention] must be known to the Legislature and must transcend a statement of the individual opinion of a given legislator or advocate. . . . [G]iven material will best reflect legislative intent only after the Legislature can be shown to have understood that its purpose was reflected in that material." (Recommendations of the Final Rep. of the Subcommittee on Leg. Intent of the Assem. Com. on Rules, 28 Assem. Interim Com. Rep. (1961-1963) No. 1, Adoption of New Materials, p. 25, 2 Appen. to Assem. J. (1963 Reg. Sess.)

With this in mind, we examine the extrinsic evidence. It shows that administrators in the California Health and Welfare Agency had notions case law holding that IHSS workers are employees of the county might be premised on a liberal interpretation of the workers' compensation statutes. This information was sent to some members of the Legislature and legislative staff to persuade them to enact section 3351.5, subdivision (b) as a less costly alternative to this prospect.[26] However, the documents fail to illuminate whether this information was the basis of the action of the Legislature or, alternately, was known merely to an illuminati of less than the whole body.[27] If our posture were one of freedom to choose between competing interpretations of a statute, less than compelling inferences of the purposes of the legislative body might be grist for our mill. However, no fine weighing of such inferences is necessary. These extrinsic aids are dispositive only if they compel resolution of any ambiguity in the statutory language in favor of the meaning contended for by the state. (§ 3202.)

This evidence is inconclusive of corporate intent to limit coverage to the employment relationship with the recipient. We are directed to construe workers' compensation law in favor of coverage, unless exclusion from coverage is unmistakably expressed in the terms of the statute. This rule of construction is woven into the fabric of the workers' compensation law. To disregard it in pursuit of inconclusive evidence, consisting of notions advanced by some supplicants to the legislative process, disserves rather than promotes the principle of legislative primacy. To grant credence to a less stringent standard would disobey the legislative directive of liberal construction and betray legislative members who voted to *extend* coverage to a group they perceived to be excluded with *no thought their beneficent impulse would later be construed to an opposite end.* (See fn. 22, *ante.*)

## IV

Argonaut raises one final and meritorious contention pertaining to its liability as compensation insurance carrier. Argonaut contends it is not

---

[26] One of the documents of which we are asked to take notice is a memorandum on the stationery of the state Health and Welfare Agency, dated June 23, 1978, addressed to "Members of the Assembly." It states: "This bill resolves the question of who is the employer of the In-Home Supportive Services (IHSS) workers . . . . AB No. 3028 resolves this issue by designating the recipient as the employer . . . ." But, as we have emphasized, subdivision (b) of 3351.5 does not say the IHSS recipient is "*the only*" employer of the IHSS worker; rather, it says the recipient is "*an*" employer of the worker.

[27] There may be numerous opinions held by participants in the legislative process about what legislation will accomplish. They may or may not be correct. That is why legislative intent must be found in the language of the statute and extrinsic aids are relevant only to resolve ambiguities in the language.

responsible for coverage for Bouvia because its contract with the state is only for the derivative liability of the individual IHSS recipients in their role as employers. Argonaut argues the Workers' Compensation Appeals Board incorrectly found Ms. M. was an employer of Bouvia in view of the exclusion of section 3352, subdivision (h). Further, the argument continues, the board incorrectly then found that Argonaut was the carrier of Ms. M. qua employer at the time of the injury.

Argonaut's arguments on this point are persuasive. The state acquiesces in Argonaut's claim. The insurance contract documents in the record unequivocally support the conclusion it was intended Argonaut not insure the state for workers' compensation liability not predicated upon the obligation of a recipient.

The facts show that Bouvia was employed with Ms. M. for less than 52 hours "during the 90 calendar days immediately preceding the date of the injury" required by subdivision (h) of section 3352 for coverage with the recipient.

Accordingly, we reverse the decision of the Workers' Compensation Appeals Board insofar as it predicates coverage upon the employment relationship with Ms. M. and insofar as it finds that Argonaut is thereby derivatively liable as the compensation insurance carrier. With these exceptions, the decision of the Workers' Compensation Appeals Board is affirmed. The case is remanded to the board for such action as is necessary and consistent with this opinion.

Sparks, J., and Sims, J., concurred.